**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| |
|---|
| **JOSEPH TRIGLETH**<br>**Versus**<br>**OCEAN BELT MARITIME, INC.AND OCEAN LONGEVITY SHIPPING AND MANAGEMENT CO.,LTD** |

# EXPERT'S WRITTEN REPORT

(RULE 26(a) (2) (B) FRCivP)

**Civil Action 2:23-CV-00065**

February 4, 2025




I, Captain Ronald L. Campana, designated expert for the Plaintiff, Joseph Trigleth, herewith provide the written report concerning matters on which I am expected to offer testimony.

***CONTENTS***

SUMMARY……………………………........................................................2

BACKGROUND ………………………………………………………….………3

METHODOLOGY…………………………………………………….…….…..4

SUMMARY OF FACTS AND OPINIONS...............................................5-7

CONCLUSIONS AND OPINIONS........................................................8-9

**EXHIBIT**
**1**

**JOSEPH TRIGLETH**
**Versus**
**OCEAN BELT MARITIME, INC.AND OCEAN LONGEVITY SHIPPING AND MANAGEMENT CO.,LTD**

## SUMMARY

I have been retained by the Blake Jones Law Firm, LLC, to consider the issues and facts in this case and render opinions regarding an incident that took place on January 29, 2021, involving Mr. Trigleth that occurred while working on the M/V "*Ocean Belt*". In making my determination, I reviewed the following:

1. Deposition of Plaintiff, Mr. Joseph Trigleth taken December 4, 2024, with exhibits;
2. Photos from David Whitmore;
3. Photos from Patrick Eskew;
4. Photos from Joseph Trigleth;
5. Documents and Material Requested from Cooper-Consolidated (Cooper);
6. 110 document provided by Cooper;
7. Subpoena for Production of Documents;
8. First Request for Production of Documents (Trigleth);
9. First Set of Interrogatories (Trigleth);
10. Trigleth Answers to First Set of Interrogatories and Request for Production of Documents;
11. Attachments;
12. Interrogatories to Defendant;
13. Defendants Production of Documents under Subpoena;
14. Emails under Bates stamped Oceanbelt 000288-000423;
15. Second Amended Complaint;
16. USCG PSIX data on M/V ***Ocean Belt***;
17. International Safety Management Code.

## BACKGROUND INFORMATION

A) The M/V ***Ocean Belt*** (IMO: 9384930) is a gearless Panamax bulk carrier and is sailing under the flag of Hong Kong. Her length overall (LOA) is 224.94 meters, and her width is 32.26 meters. She was built in 2008. She has seven (7) holds.

B) Mr. Joseph Trigleth was a ship supervisor for Cooper on the MV ***Ocean Belt*** on January 29, 2021, working the night shift. His job was to supervise the discharge of bags of cargo from the ship to barges alongside the ship.

C) Weather was not a factor in this case.

D) The vessel was working at the Cooper-Consolidated mid-stream buoys, in Laplace, LA.

E) Based upon the testimony in this case, as Mr. Trigleth was documenting by photographs, the bags of cargo being discharged from the cargo hold No.5. In order to observe and photograph the cargo being loaded into the barge, he had to cross over the vessel's deck piping by stepping on the cross over steps/platform along the portside between Holds 5 and 6 to access the outboard side of the vessel. As he did so, someone had placed a four (4) wheel portable dolly just forward of the step/platform which had aluminum stanchions on the dolly and some of these stanchions overlaid the inboard step. When he went to place his foot on the step, his foot landed on the stanchions resulting in him slipping and injuring himself.

F) The vessel had a valid ISM Document of Compliance on January 29, 2021, indicating she was in full compliance with SOLAS requirements for a Safety Management System.

G) Cooper and the vessel performed the Turnover duty as required and Cooper completed their checkoff safety sheet without any deficiencies being noted on the vessel.

H) The Incident occurred at approximately 2320 hours and there are no lights between the cargo holds on a bulk carrier.

## METHODOLOGY:

I, Captain Ronald L. Campana, reviewed the available case documents and testimony regarding the alleged accident involving Mr. Trigleth that occurred at approximately 2320 hours January 29, 2021, while transiting from the interior deck to the exterior deck between holds number 5 and 6 via the step platform.

In evaluating the marine aspects of the incident, I reviewed the pertinent International and US Laws. I have not personally inspected the MV ***Ocean Belt*** but have been on thousands of similar bulk carrier vessels. I am very familiar with the area between hatch covers as well as the step/platform to crossover of deck piping. I have had extensive experience on bulk carriers from many years as a marine surveyor and port captain. I am a graduate of the United States Merchant Marine Academy, Kings Point, NY and have held various USCG and Panamanian licenses, including Master, as per my CV.

The findings below are based upon the above, as well as my knowledge of vessels and the proper procedures for maintaining marine safety and security, determining the risk factors for jobs, and common sense for protecting life, limb, and property while at sea. Additionally, my findings are based on my experience on ships, supply vessels, towing vessels, my experience in the field of marine surveying, independent investigation (as per my enclosed resume), and consultation with appropriate publications and governmental agencies. These findings are based upon a reasonable degree of professional certainty.

**JOSEPH TRIGLETH**
**Versus**
**OCEAN BELT MARITIME, INC.AND OCEAN LONGEVITY SHIPPING AND MANAGEMENT CO.,LTD**

## SUMMARY OF FACTS AND OPINIONS

1) Mr. Trigleth testified on page 207 how his accident occurred.

*A. Yes. The cargo was swinging to the barge, and I went to step over the steps and I slipped on a handrail pipe on a dolly. It spun out from under my feet, and whatever I grabbed, it jammed everything up and I twisted my back. After that, I was irritated; I reset, made sure everything -- I moved the dolly out of the walkway so it was no longer against the steps and made it safe and continued working.*

*Page 208*

*Q. You had traversed those steps multiple times earlier in the night, correct?*
*A. Correct.*
*Q. Was the dolly there earlier in the night?*
*A. Not that I had seen.*
*Q. Did you see who put it there?*
*A. It would have been the ship's crew --*
*Q. Did you see who put it there?*
*A. I did not.*

*Page 213*

*A. I slipped on the first step, so when I got on this step is when I stepped on the pipes.*
*Q. Was it your right foot or left that stepped on the pipes?*
*A. It was my right foot.*
*Q. So the dolly was here, and the pipes were sticking over the steps?*
*A. Correct. They were over the steps.*
*Q. And it had not been like that the rest of the night?*
*A. No, sir.*
*Q. But you don't recall seeing any crew in that area earlier in the night?*
*A. I do not recall seeing any crew.*

*22 Q. So your right foot steps on the pipe.*
*23 Then did you slip backwards or forwards? Did*
*24 you slip side to side?*
*25 A. I slipped upriver, towards the bow.*

2) Mr. Trigleth had crossed over this platform numerous times during the night prior to his in incident without any problems.

3) Only the ship's crew could have moved the dolly and stanchions to the location where they became an obstruction to safely walking over this path. Mr. Trigleth testified that he did not request the vessel crew place the stanchions around the hatch cover. On page 211:

*" Q. Do you recall -- actually, the safety*
*7 rails would be put in place on an open hold,*
*8 correct?*
*9 A. Correct, if requested by myself or the*
*10 flagger.*
*11 Q. Did you request those?*
*12 A. No, Willy doesn't work on top of the*
*13 hold; he is scared of heights."*

and on page 221 Mr. Trigleth testified it was the ship's crew who placed the stanchions and safety rails and Cooper's crew never touched them.

*9" Q. We talked about who installs the*
*10 safety rails on the hatch covers. Do the Cooper*
*11 crew ever remove those?*
*12 A. We don't touch those at all."*

4) The International Safety Management Code (ISM Code) was introduced in 1993 following a series of maritime incidents. The International Maritime Organization (IMO) established the code with the aim of ensuring the safety of ships, preventing marine pollution and protecting the maritime environment.

5) ISM Code (2010) Section 1.2.2: Safety management objectives of the Company should, *inter alia:*

1 provide for safe practices in ship operation and a safe working environment;

2 assess all identified risks to its ships, personnel and the environment and establish appropriate safeguards; and

3 continuously improve safety management skills of personnel ashore and aboard ships including preparing for emergencies related both to safety and environmental protection.

6) The objectives of the Code are to ensure safety at sea, prevention of human injury or loss of life, and avoidance of damage to the environment, in particular, to the marine environment, and to property. The code highlights that in matters of safety, individuals' efforts, competence and motivation help achieve a positive result. The objectives of the Code are to ensure safety at sea, prevent human injury, ensure personnel safety, and avoid damage to the environment, especially to the marine environment. It can be said that the code focuses on bringing marine safety to a common platform for vessels of all nationalities by laying down certain safeguards, general principles and objectives. This eliminates any discrepancies in the maintenance of a much-needed safety protocol. The code applies to all vessels, including oil tankers, chemical tankers, cargo ships, gas carriers, bulk carriers, passenger ships and offshore structures.

7) The crew of the M/V ***Ocean Belt*** should have been trained not to leave a portable dolly near the step/platform over the deck piping and specifically not to create a hazard to the walkway.

8) I do not have the SMS of the vessel, or any reports generated by the vessel as required by the Flag State and their ISM or SMS. Nor do I have any depositions of any crewmembers or other Copper workers from that night.

9) The photographs I reviewed of the measurements of the dolly and aluminum stanchions by the Fernandes Maritime surveyor show the dolly flat surface to be 31.5" in length and the aluminum stanchions to be 43" in length. Therefore, it is possible the stanchions overhung the dolly by up to 12". The photographs also show the dolly closely aligned with the step.

10) During nighttime operations, the floating derrick has a flood light that shines onto the vessel when the hook is being lowered/raised from the cargo hold. As the crane swings the load, the light also swings and creates shadows between the adjacent cargo holds and the area where the crossover is would be in a non-lighted area.

## CONCLUSION AND OPINIONS

- The MV ***Ocean* Belt** is a gearless seven hold/hatch bulk carrier that was discharging bags of cargo in Laplace on December 29 , 2021. She is a standard mini supply vessel.

- Based on Mr. Trigleth's testimony, and the Incident report of Cooper, safety guidelines were not followed by the vessel. Whoever in the crew transported the dolly with the stanchions and parked it just forward of the step/platform between hold 5 and 6, did so in a dangerous and haphazard manner allowing the stanchions to partially overlay the step.

- In my opinion, this accident was totally avoidable had the vessel followed standard safety protocols in not obstructing a walkway or pathway. There is a duty officer on watch and while working cargo either the duty officer or his designee must be on the deck observing the cargo operations. Beside their duty to make rounds every hour or a time interval set in their SMS, they also monitor the stevedoring operations to ensure no damage is done during the operation to cargo or the vessel. Someone instructed a crewmember to place the dolly just forward of the step/platform between holds 5 and 6 on the portside, inboard of the deck piping. This created a hazard.

- Mr. Trigleth passed over this platform numerous times during his shift on the vessel and it was not until they took a break and came back that he had a problem. He testified he never saw the dolly until he slipped. A rolling dolly should never be left on deck unsecured. Stanchions overhanging a step is never permitted and the crewmember who left it in that position was improperly trained and supervised. More probably than not, based on Mr. Trigleth's testimony, the crane was swinging the bags to the barge and there was no light(s) shining in the area between holds 5 and 6 which had the step/platform in the dark.

- I do not have the Flag State report, Vessel Incident Report or Corrective Action report as required by the ISM. Neither do I have the deposition of "Willie", the flagman who was on duty working hold 5 that night.

- All opinions included in the Background Information and Statement of Facts above are intended to be incorporated here as well as Conclusions and Opinions.

**JOSEPH TRIGLETH**
**Versus**
**OCEAN BELT MARITIME, INC.AND OCEAN LONGEVITY**
**SHIPPING AND MANAGEMENT CO.,LTD**

The undersigned intends to or may use part of, or all the photographs/videos introduced by any party.

The undersigned intends to or may use any part of, or all photographs of the vessel displayed on ELMO or overhead projector.

The opinions expressed here are those of Captain Ronald L. Campana. I reserve the right to modify my opinion should additional information be made available to me.

Captain Ronald L. Campana
(For Campana Marine Service, Inc.)