FMC INTERNATIONAL

3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002

***By Electronic Mail:***

March 14, 2025

Lauren Burk, Esq.
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
201, St. Charles Avenue, Suite 3600
New Orleans, LA 70170

Attn.: Lauren Burk, Esq.

**RE: M.V. "OCEAN BELT" (IMO No. 9384930)**
**Our Ref.: FMC-0012-0125**
Alleged injury to longshoreman, Mr. Joseph Trigleth, on board on January 29, 2021.

Dear Ms. Burk,

We refer to your request, on behalf of the interests of **"OCEAN BELT"**, seeking our review and opinion on the alleged injury sustained by longshoreman supervisor, Mr. Joseph Trigleth, while on board the subject vessel on January 29, 2021.

In order to respond to your request, I have boarded the freighter "**OCEAN BELT",** conducted a detailed examination and taken measurements of the site of the alleged incident on board, and have reviewed the information and documents you made available, a listing of which is appended to this report.

As an introduction, I am a Senior Master Mariner with thirty-five (35) years of experience in the maritime profession. During this time, I have commanded large ocean-going bulk carriers including those comparable in size and displacement to the **"OCEAN BELT"**, very large crude carriers (VLCCs), and other ocean going vessels operating worldwide. *Specifically, I have sailed and carried out cargo operations on numerous occasions in the Lower Mississippi River.* I therefore have first-hand experience of the conditions prevailing during the alleged incident.

After my 18-year sea-going career, I stepped ashore where I worked as a superintendent and subsequently as a surveyor. During that time, I conducted investigations into numerous incidents and accidents involving crew, equipment and machinery. Additionally, I routinely conducted safety training, developed Risk Assessments matrixes, oversaw their implementation and evaluated their effectiveness. My work has won me many recognitions including the "Maritime ICON" award for my contributions to the maritime industry.

I am currently employed as a Senior Consultant with FMC International LLC. My full *Curriculum Vitae* is appended to this report.

Based on all of the foregoing, I possess the qualifications, knowledge, and firsthand experience to offer expert testimony on Mr. Trigleth's alleged injury.

EXHIBIT
2

FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002

## Alleged Incident

At approximately 2320 hours on January 29, 2021, the subject freighter was engaged in unloading cargo bags into barges while the vessel was moored at the Cooper Consolidated Midstream Buoys, 134.5 MM AHP, Lower Mississippi River, LaPlace, Louisiana. That day, Mr. Joseph Trigleth was the stevedore night shift supervisor. He alleged that while ascending the steps leading to the cross-over platform located between Cargo Hatch (CH) #5 and #6 on the port side, he fell causing him injuries.

According to Mr. Trigleth, he placed his foot on the first step of the platform to cross to the outboard side when he stepped on the ends of pipes that were allegedly protruding onto the step from a dolly (hand cart) stored nearby causing him to lose his footing. As a result, he alleges, he attempted to regain balance by grasping the dolly handle, causing the dolly to move, resulting in his fall. He attributes the improper positioning of the dolly and the improper storage of the pipes on the dolly, specifically of their ends protruding onto the platform's step, to have created a hazardous condition leading to the incident.



Cross-deck; Step leading to platform; Cross-over platform; alleged location of dolly during incident; pipelines

## Investigation

In order to investigate the allegation, on January 17, 2025, I physically attended on board the subject vessel while she was moored at the Cooper Consolidated mid-stream buoys, MM 134.5 AHP, Mississippi River, LaPlace, La, the same site where the alleged incident took place.

I examined the entire site of the alleged injury, conducted mock walks by the vessel's crew, placing the dolly, alleged to have been pivotal in the cause of the injury, in position and took numerous photographs, and, with the assistance of my colleague, Capt. Nan Oo, took measurements of the vessel's deck features

info@fmc.international (USA)
operations@fmc.international (Global)
www.fmc.international



USA - Greece - Singapore - Italy - Cyprus - Turkey
Toll free: +1 (888)-764-3612
24 hours: +1-504-304-1932
Fax : +1-504-500-9332

FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002

and equipment involved in the alleged slip/fall incident. Notably, the inspection occurred almost four years after the alleged injury, and the dolly is not the same dolly that was on the subject vessel in January 2021.

## Analysis of the Incident

After reviewing all available documents and testimony provided by Baker, Donelson *et al* relating to the alleged accident, including the deposition of the plaintiff, Mr. Joseph Trigleth, dated December 4, 2024 and the expert report by Capt. Ronald L. Campana, dated February 4, 2025, the plaintiff's expert, I present the following findings and express the following opinions:

According to his deposition testimony, Mr. Joseph Trigleth, born 1969, was employed as a shift supervisor by the stevedoring firm of Cooper Consolidated LLC. He had a total of 16 months of experience working on ships. Prior to becoming a supervisor, Mr. Trigleth worked as a flagger, essentially signaling the crane operator. In his deposition, Mr. Trigleth states that on January 29, 2021, he was assigned the night shift, serving in the dual roles of supervising the ongoing cargo operations and ensuring the safety of the personnel under his supervision. He, additionally, held the role of surveyor.

Mr. Trigleth notes that he was familiar with the vessel's layout having worked on the subject vessel on other occasions in the past.

The night shift, on January 29, 2021, began at 1930 hours. That day, as noted, Mr. Trigleth held the dual roles of shift supervisor and surveyor for the vessel. On boarding the vessel, he reportedly conducted safety meetings and briefed his personnel working on the barge and in the hold.

According to the recorded times in the ship's deck logbook, cargo unloading operations for the night shift commenced at 2133 hours, earlier having been suspended on conclusion of the day shift. A shore crane breakdown was attributed to the delayed commencement. Cargo discharge operations were only being conducted from Cargo Hold (CH) # 5.

During this time, Mr. Trigleth traveled across the deck multiple times between port and starboard sides around CH #5, and in his dual role of surveyor to photograph cargo bags being lifted from CH # 5 and being unloaded onto the barge. This included multiple instances of crossing over the cross-over platform (i.e. the step/platform) that he claims he later fell on. This would have required him to engage his camera while crisscrossing the deck (both forward/aft and starboard/port) over the two hours between commencement of discharge at 2133 hours and the alleged incident at 2330 hours. His responsibility also involved taking videos of torn cargo bags.

Mr. Trigleth confirmed that his path was clear of obstructions during his duty (page 188, Line 24) and that housekeeping in the area around CH # 5 was "good." He was well-acquainted of the area between CH #5 and CH #6, referred to as the cross-deck between the cargo hatches. Since no other cargo hold was being worked on, he specifically noted that the lighting on deck was "adequate" (page 188, Line 3), which he implied made walking safe and enabled sighting any potential hazards that might cause trips and falls. He stated he had "no issues" walking in that area (page 188, Lines 14 - 17).

FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002

## Deck Lighting:

The above description of adequate lighting is likely and very plausible because the cross-deck area between CH #5 and #6 houses the Deck Store, which typically serves as a storeroom for deck equipment. The top deck of this Deck Store is fitted with two flood lights, one directed towards the port side and the other towards the starboard side, specifically to illuminate the cross-deck areas. In this case, the port-side light was positioned to illuminate the crossover platform (in addition to the large lights from the crane barge), which crosses over the deck pipelines running along the deck and hatch covers, and the site of the alleged incident.



Deck lighting on top deck of Deck Store pointing towards crossover platform

In spite of all of the above, Capt. Campana, the plaintiff's expert, in his report, claims that *no lights were between the cargo holds (*Page 3, Point H; see also Page 7, Point 10). This is in diametric opposition to Mr. Trigleth's own admission of adequate lighting. Additionally, I find this claim impossible to support because from my decades of experience as a merchant mariner if there were no lights, the stevedores would have immediately stopped cargo operations until adequate lighting was fully restored.

Reference is also made to the checklist filled out at 1641 hours on January 29, 2021, and submitted by Mr. Jason Landry, Cooper Consolidated LLC, (Submission #247112, Bates page CooperConsolidated-000017), which notes that the box next to "*adequate lighting for night operations"* was confirmed as "*Yes*.".

The following photo demonstrates the positioning of the lights mounted on the top deck of the Deck Store between CH #5 and #6:

info@fmc.international (USA)
operations@fmc.international (Global)
**www.fmc.international**



**USA - Greece - Singapore - Italy - Cyprus - Turkey**
Toll free: +1 (888)-764-3612
24 hours: +1-504-304-1932
Fax : +1-504-500-9332

FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002



Photo showing port and starboard lights on top of deck of Deck Store and pointing toward respective crossover platforms

Since no tall structures obstructed the deck light's beam as shown above, the light would illuminate the platform without creating any shadows. Based on my extensive experience serving on similar vessels and inspecting them for accident investigations, I can confirm that these floodlights are designed to illuminate areas effectively and provide ample lighting.

*Based on all of the above, any suggestion of inadequate lighting on deck on the night of January 29, 2021, is simply false. It did not contribute to Mr. Trigleth's alleged fall.*

In the interest of clarifying if the lights were indeed part of the deck fitting even prior to indent, we are presenting below photograph of the vessel (courtesy-OCEAN BELT - Vesseljoin)



*Net photo from https://vesseljoin.com/vesel/ocean-belt*

FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002

**OCEAN BELT**'s former name was **STAR OF SAWARA** under Panama flag as found in class NK records.

Distractions:

In the two-hours of cargo operations during the shift on the night of January 29th, Mr. Trigleth had to walk around CH #5, taking photographs and videos of the cargo, which necessitated him moving to different positions on the cross deck and importantly, to cross over the deck pipelines to capture pictures of the bags in the holds and those being unloaded onto the barge. While Mr. Trigleth was engaged in taking numerous photographs of the cargo operations, as required in his dual role as a surveyor (Trigleth Depo, Page 131, Line 8 and Page 121, Line 9), it required him to focus on his camera while also traversing the ship's cross deck around CH#5. Taking numerous pictures and videos (see for example Deposition p. 192-194) focusing on the camera lens while simultaneously crisscrossing a ship's deck is a serious tripping hazard and dangerous behavior, not expected from a stevedore supervisor responsible for the safety of himself and that of the stevedores under his supervision. This activity could also have reasonably affected his ability to judge walking path and step heights, the site of his alleged fall. Proper height perception is essential when climbing steps, and this distraction and even disorientation as he stepped onto the step to ascend on to and cross the platform, contributed to his alleged fall.

Claim of guard rail pipes (stanchions) lying on the platform steps being unrealistic:

As noted, on January 17, 2025, I boarded the vessel to inspect the arrangement of the cross deck around CH#5 and #6, inspect the pipes (stanchions / guard pipes used around the boundary of the hatch covers) that allegedly protruded onto the portside platform step between CH#5 and #6, and to take measurements.

With my experience aboard similar bulk carriers, I reconstructed the circumstances that resulted in the alleged injury to Mr. Trigleth using an onboard dolly (depicted in the photos below). I considered the path(s) Mr. Trigleth would have taken that night based on his testimony and took measurements of various structures and deck fittings and examined the deck's general arrangement to verify the event as described.

While the dolly used for the reconstruction was not identical to the one allegedly used during the incident (based on photos provided by Cooper Consolidated), we attempted to recreate the scenario. The comparison photos revealed that the dolly used for the reconstruction (on left in picture below) was slightly taller (that is, the platform of the dolly was higher off the deck) than the one allegedly in use during the incident (on right) in the photographs below.

FMC INTERNATIONAL

3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002











Our measurements showed that the height of the dolly platform used during my attendance was 0.4 inches lower than the step. Therefore the dolly platform on the night of the incident was even lower.

FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002

Longitudinally, if the dolly had been placed in the area (gap) between the platform step and the freshwater pipeline (blue color pipeline), measuring 43 inches, and the stanchions placed on the dolly, they could not have reached the step much less protrude over and lay on the step.




We measured the stanchions (the pipes that allegedly protruded and lay on the platform step), and found they measured 40 inches in length. The distance between the forward edge of the step and the 90 degrees bend in the pipe ahead of the step/platform, on the other hand, was 43 inches. The stanchions (pipes), measuring 40" therefore were shorter than the gap between the step and the freshwater pipe bend.






The above measurement photographs confirm ample space between the steps and the ship's pipes, even with the dolly positioned in this gap.

Additionally, if the pipes/stanchions did protrude beyond the dolly platform, it would have been logical and natural for the crew to have placed the protruding free ends towards the free end of the dolly platform (i.e. towards the blue pipeline in the photos above) rather than have them protruding from the aft (towards the step) because the dolly was reportedly located with its handle adjacent to the step and had these stanchions been protruding from the aft, where the handle was, they would have proven impediments for the crew pushing the dolly because the pipes would have struck their legs while taking a step, something no crew member would do. Also, even if the dolly were placed in the opposite orientation (with the handle near the blue pipeline and the free end near the step), as noted above, the pipes/stanchions would necessarily have been lower than the step and could not have protruded over the step.

FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002

The above reveals that the claim of stanchions being on the dolly and them protruding beyond the dolly and lying on the platform's step is not possible both because the pipes would have been lower than the platform step (because dolly's platform was lower than the step) and because the ends of the stanchions, even if protruding, would have been facing the opposite direction, i.e. away from the step, and therefore not protruding over and laying on the platform step.

I measured the dolly on board. The reference dimensions are provided below. As previously mentioned, and observed (in photographs), the dolly present during the incident appeared smaller than the one found on board during inspection.

| | |
|---|---|
| Height of dolly bed from vessel deck | 10.6 Inches |
| Height of dolly wheels | 8.0 Inches |
| Height of dolly handle from vessel deck | 34.6 Inches |
| Height of dolly handle from vessel bed | 22.5 Inches |
| Length of dolly | 31 Inches |
| Breadth of dolly | 21 Inches |

These measurements further mathematically demonstrate that any pipes stored on the dolly would not have encroached upon the platform step; instead, they would have remained within the available space, i.e. the space between the pipes and platform step at the location. This space where the dolly was allegedly positioned was more (longer) than the stanchion itself. The gap between the blue color pipe and the platform step measured 43 inches and the stanchions' lengths were only 40 inches.

## Inconsistencies in Mr. Trigleth's account of the fall.

The above measurements further reinforce the inconsistencies in Mr. Trigleth's account of the fall. If the dolly was positioned with its handle near the platform (see deposition p. 224) , its height relative to his body would have made it an obstruction (i.e. braced his fall) rather than a contributing factor to his fall. At 6'3" in height, Mr. Trigleth is significantly taller than the dolly handle, making it improbable that he could have grabbed the handle in mid-fall. Instead, his thighs would have struck the handle first, arresting or altering his fall trajectory. If the dolly was positioned with its handle near the blue pipes (which, as noted above), it is unlikely Mr. Trigleth would have been able to grab the handle without falling all the way to the deck, which he testified he did not do.

This description of the fall raises several other concerns regarding its plausibility. If Mr. Trigleth's right foot was allegedly on the pipes lying on the step and his left foot was in the air, his balance would have been compromised even before slipping. However, the fundamental issue is the mechanics of his fall. If he dropped to his right side (upriver) and onto the ship's pipes, then his ability to grab the dolly handle mid-fall and for it to roll in such a way as to contribute to his fall seems questionable.

FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002

Additionally, the limited space between the dolly's storage position and the bend in the pipes reveals that the dolly would not have rolled away freely. A deliberate lateral force would have been needed for the dolly to move, contradicting the claim that it simply rolled upon being grabbed. If he had slipped on an object, his natural momentum would have directed his fall forward or backward rather than sideways.

All these factors combined firmly suggest that the circumstances of the fall, as described, do not align with the physical evidence on board.




Dolly placed on board during scene reconstruction, as described. Height of dolly handle is 34.6" (less than 3')

<u>Noise generated by dolly movement:</u>

In addition to all of the above, considering the considerable noise generated when the dolly (without pipes on it) was rolled into position on the deck during the reconstruction, it is reasonable to assume that if the dolly with pipes had been moved next to the steps during cargo operations, Mr. Trigleth or other personnel would have noticed/heard the movement of the dolly in the area. His statements confirming a clear walkway and good housekeeping further challenge the claim that an obstruction played a role in the alleged fall. (Trigleth deposition page 208, Line 2 through 7) Likewise, his testimony that he never saw any crew in the area of the incident indicates that it was not vessel crew who moved the dolly/pipes into the position he alleged it was in.

<u>Suspicion over Mr. Trigleth crossing deck pipelines without using a cross-over platform</u>

During my visit, we measured the entire cross-deck fittings to find out the possible path that Mr. Trigleth must have taken that night.

*In Exhibit 13 of Mr. Trigleth's deposition, the location that he marks of the fall contradicts his verbal description of the incident* raising further doubts about the accuracy of his testimony.

By closely comparing the physical layout with his deposition statements, below, we highlight these discrepancies and establish whether his fall occurred at the steps or elsewhere.

FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002




Above is a section of the vessel's General Arrangement (GA) Plan, and below is the relevant part of its pictorial representation.



FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002

The Deck Store (the rectangular house in between) divides the cross-deck into two clear pathways, one forward of the Deck Store (towards CH #5) and the other aft (towards CH #6).

Both forward and aft sides of the Deck Store (used to store the ship's equipment and stores) have clear pathways to access either side of the vessel.



Above photo was taken from the top of the Deck Store, looking towards the port side. The platform (partially obstructed by two individuals in vests) and clear pathways on both sides are visible.

The grey pipe running forward-aft across the cross deck is an electrical conduit housing cables from the vessel's electrical control boxes. The crossover platform is positioned on the aft side of the deck (slightly obstructed by the two individuals with vests), extending over the pipelines and aligning with a designated clear passageway located aft of the Deck Store. *The passage on the forward of the Deck Store also provides access across the deck, however, unlike the aft passage, this route requires stepping (onto and) over pipelines to reach the area beneath the port-side hatch covers. (It does not have a cross over platform)*

FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002

In his deposition (Page 211, Lines 4-7), Mr. Trigleth identified the alleged accident location by marking an "X" with his initials "JT." This marked position is documented in Exhibit 13, which is attached to his deposition.




As is clearly demonstrated, the location marked with an "X" does not correspond to the authorized or safe crossing point over the deck pipelines, which is on the aft side of the Deck Store and features a platform (platform not shown in this drawing).

It is reasonable to assume that Mr. Trigleth crossed at the location marked "X". The marked location is particularly convenient (as opposed to the stair/platform location) because cargo operations were taking place in CH #5, making this crossing closer and more accessible for taking photos of the cargo bags inside the hold from the walkway located forward of the Deck Store. Mr. Trigleth confirms that he walked on the aft of the CH #5 coamings (Trigleth Depo, Page 200, Lines 5-9). Additionally, a closer inspection of the photographs submitted by Mr. Trigleth reveals that all the images were taken from this area immediately aft of the CH #5 coamings.

Additionally, based on my extensive experience with vessels of this type, stevedores often choose to bypass the platform steps and cross over the pipelines. This is common, as the steps are at the aft and therefore farther away, and also are cumbersome to climb, notably when one has to do it repeatedly over the course of a shift. On the other hand, it is easier to cross the pipelines directly rather than climb the step and cross the platform, although the direct crossing is a wrong practice, being unsafe and a tripping hazard.

For the above stated reasons and based on his marking of the vessel schematic during his testimony, it is reasonable to assume that Mr. Trigleth, while repeatedly traversing the area performing his duties as a surveyor, tasked with taking numerous photos throughout the night, crossed the pipelines to reach the other side quickly and did not use the step/platform.

FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002



The location marked by Mr. Trigleth on Exhibit 13 aligns with his two statements in the deposition (Page 216, Line 12), where he states "My arm hit something," reasonably corresponding to the fire hydrant in the photo. Additionally, based on fresh memory, his Incident Report refers to "falling into the ship's pipes" (Exh. 4 – incident report).

This discrepancy bolsters the opinion that Mr. Trigleth may have attempted to cross the ship's pipelines at an unauthorized and unsafe location, contributing to his alleged fall.

**Comments on Capt. Ronald L Campana's report dated February 4, 2025:**

After reviewing the report submitted by Capt. Ronald L. Campana, I offer the following observations. The report appears to be based on Mr. Trigleth's deposition.

Capt. Campana has not attended on the vessel and, therefore, did not examine its layout or reconstruct the incident scene. Consequently, the background information provided by Capt. Campana in his report and methodology and conclusions used are apparently based on his general experience rather than an actual inspection on board the vessel and of its equipment.

I also observed that Capt. Campana makes several generic statements in his report. For instance, on Page 3, Point H, he asserts that *no lights were on deck*. This statement appears to have been made without verifying the facts. Based on my inspection of the vessel, I can confirm this claim is incorrect. As documented in the accompanying photographs, lighting fixtures were fixed atop the Deck Store, and the port-side light was positioned at an angle that directly illuminated the platform.

FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002

a) It is unclear whether Capt. Campana reviewed Cooper's Job Safety Analysis (JSA) from 29 January 2021 or if his statement in Point H on Page 3 is another general assertion. According to the records submitted by Cooper, the JSA for that specific day was missing. Therefore, it is uncertain as to which safety checklist Capt. Campana is referring to in his report? Moreover, as noted above, the checklist filled out at 1641 hours on January 29, 2021 confirmed "*adequate lighting for night operations"*

b) In his methodology statement, Capt. Campana references his knowledge of "...maintaining marine safety and security..." but fails to acknowledge that a security assessment of a vessel is mandatory under the ISPS Code (International Ship and Port Security Code). A competent authority conducts this assessment, or a recognized organization (RO) authorized by the vessel's flag state to issue an ISPS certificate. A critical aspect of this security assessment includes evaluating deck lighting and identifying shadow areas. For the record, the **"OCEAN BELT"** holds a valid ISPS certificate issued by the flag authority and a corresponding Ship Security Assessment record demonstrating the vessel's compliance with its regulations.

ISPS code clause 9.46 states

"The ship's deck and access points to the vessel should be illuminated during hours of darkness and periods of low visibility while conducting ship/port interface activities or at a port facility or anchorage when necessary."

c) On Page 6 of Capt. Campana's methodology, Points 2 and 3, assume that the ship's crew had moved the dolly to that location. However, this assumption lacks a factual basis. The plaintiff testified that he did not see who put the dolly where he claims it was (p. 208); did not see the dolly/stanchions in the area prior to the incident (p. 208); and also that he did not see any crew in the area of the incident prior to the incident occurring (p. 175, 213). Further, a key question arises: if no instructions were given to rig the stanchions on the hatch cover for boundary safety guardrails (as Plaintiff's testimony confirms), why would the stanchions have been removed from the Deck Store and placed in that specific location? This calls into question the accuracy of Capt. Campana's conclusions regarding equipment placement on deck.

Additionally, prior to the alleged incident at 2330 hours, Mr. Trigleth crossed that area multiple times during his two hours of active duty that night without encountering any obstructions or pipes. He had also confirmed that the *area was clear*. Given this, it is improbable that the pipes would have suddenly appeared without any order to rig the stanchions or any sighting of crew members moving equipment on deck. Therefore, Capt. Campana's assumption that the crew moved the dolly to that location is unfounded and incorrect.

d) On Page 7, Point 9, the measurements referred to by Capt. Campana are incorrect. For clarity, accurate measurements are provided in the photographs above. The stanchions were not made of aluminum, as claimed, but were constructed of mild steel pipes. Additionally, the actual length of the stanchions was 40", not 43". The stanchions used for hatch cover safety boundary guards are

FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002

heavy, further contradicting Capt. Campana's assertions. I have also explained the pipes' overhanging and the free end's forward protrusion beyond the dolly base. Given this configuration, pushing the dolly with the overhanging obstruction facing the pusher would have been physically difficult and thus improbable.

e) In Point 10 on page 7, Capt. Campana again assumes that there are no lights on the cross deck. However, this is incorrect, as the top of the Deck Store on the cross deck is equipped with deck lights that illuminate both the port and starboard sides of the cross deck. Capt. Campana's statements based on assumptions and general conditions are, therefore, factually inaccurate and do not reflect the actual lighting setup on the vessel.

f) On page 8, "Conclusions and opinions."

*Comments on Paragraph 2*
Exhibit 4, the Supervisor's Investigation Report of Employee Accident/Illness, does not indicate that the vessel failed to follow safety guidelines. Unless Capt. Campana has observed something not mentioned in the form, there is no evidence in the report to suggest any deviation from safety protocols.

*Comments on Paragraph 3*

Capt. Campana concludes that the *vessel's crew transported and parked the dolly dangerously and haphazardly*. However, this conclusion is based on his assumptions and lacks corroborating evidence or witness testimony.

g) The Deck Logbook for the day of the incident, January 29, 2021, which was submitted to us by the vessel, clearly indicates that deck rounds had been carried out at set intervals, with one conducted at 2200 hours on the same day. The duty officer had duly signed the log. Capt. Campana's assumption that *someone instructed a crew member to place a dolly just forward of the platform* …… is entirely incorrect and speculative rather than based on any factual evidence.

## Conclusions and Opinions by the undersigned:

Below are my conclusions and opinions based on my inspection, review of documents and my 35 years of hands-on experience in the shipping industry, including expertise in evaluating various incidents of this nature:

1. In the absence of any photos made available by Mr. Trigleth of the scene of the incident as he claims it existed; it is difficult to believe the presence of a dolly at the location. This is particularly relevant considering Mr. Trigleth was the shift supervisor in-charge of safety and was also assigned to take photographs. Then, it is doubtful that he would have failed to document a potential hazard had he noticed one. Considering the fact that Mr. Trigleth took numerous photographs and, yet has not shared those photographs with us begs to question his motive for

FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002

not sharing them? If his allegations are true, why hide the photographs that would have proven his claim? This is particularly relevant considering his allegation of the area of incident and his own marking of the area of incident being markedly different from one another.

2. The photographic evidence collected during my visit on board **"OCEAN BELT"** demonstrates that the platform was adequately lit. Proper lighting would have allowed Mr. Trigleth to observe any potential obstructions, including pipes on the steps, suggesting the lighting was adequate.

3. The measurements taken on board by the undersigned, conclusively demonstrates that the likelihood of the pipes/stanchions protruding beyond the dolly towards the handle of the dolly and into the operator's legs is unrealistic. The distances between the first step of the platform and the bend of the pipes, forming the boundaries between which the dolly could have been placed, as well as the height difference between the first step of the platform and the base of the dolly, make it both practically and mathematically impossible for the pipes to have overlapped onto the step, thus creating a hazard for an individual stepping on that step.

4. Throughout the incident analysis, there were several inconsistencies in Mr. Trigleth's deposition, leading the undersigned to doubt the veracity of the account provided, and opines it was a cover up for not adhering to safe practices.

5. The location of the incident, as marked in Exhibit 13 by Mr. Trigleth, corresponds to Mr. Trigleth's description of the fall, where he mentions "falling upriver," "into ship's pipes," and "something hitting his back." This indicates that as he crossed the pipes not using the assigned cross-over platform to the aft but by attempting to cross the pipelines from the closer forward side closer to the CH#5 coaming, where there was no cross-over platform where he tripped and, he claims, fell sideways, where a fire hydrant protruding upwards hit him. As is on record, this location aligns with the quicker, though unauthorized, path to cross over to the outboard side. This path located immediately aft of CH #5, facilitated Mr. Trigleth's taking photographs.

   Mr. Trigleth, therefore, reasonably, crossed the pipes at an unauthorized and unsafe location. Additionally, the fall location he reported does not align with the designated safe cross-over platform. This discrepancy raises the likelihood that Mr. Trigleth's attempt to cross the ship's pipes at an unsafe point may have contributed to the incident.

6. In the modern era, with the stringent enforcement of the ISM (International Safety Management) and ISPS (International Ship and Port Facility Security) Codes under the aegis of the IMO (International Maritime Organization) and the vessel's Flag State under SOLAS, which demand clear procedures and policies for the safe operation of vessels, ship's crews are well-trained in adhering to safe practices. These safety measures are further reinforced when a ship enters U.S. ports, as USCG (United States Coast Guard) inspections impose even higher standards for safe operations and the prevention of human injury while the vessel is in U.S. waters making the allegation of crew negligence difficult to support.

FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002

An assertion of crew negligence appears to be unfounded and an attempt to obscure the facts and real causes of the incident.

7. The supervisor's responsibility for taking numerous photos during cargo operations may have impacted his focus and even perception, particularly concerning the heights of the steps. Given that he was likely using his phone and looking at its screen, this likely distracted him and even compromised his ability to accurately assess heights. Proper height perception is essential when climbing steps, and this disorientation could have contributed to the claimant failing to notice the presence of stanchions —assuming they were even present.

We reserve the right to amend our opinion and issue an addendum to our report should additional information be available for review in the future.

I trust I have addressed the issues with the information available currently. Should more information be available later, I will be glad to review such information and amend this report to the extent warranted by the new information.

**FMC INTERNATIONAL**



_______________________

Captain Gajanan Karanjikar

FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002

**Document review:**

I have reviewed the soft copies of the following documents received via email for the preparation of this report:

1. Deposition of Plaintiff Mr. Joseph Trigleth
2. Trigleth exhibits numbered from 1- 16
3. Photos submitted by Mr. Trigleth
4. Photos from David Whitmore
5. Photos from Patric Eskew
6. Photos of Steps. Dolly, pipes railing from Cooper.
7. Client photos of ocean belt operations
8. Discovery and responses – defendant to plaintiff
9. Discovery and responses – plaintiff to defendant
10. Incident report handwritten by Mr. Trigleth
11. 101-page document from Cooper Consolidated LLC of daily operations logs, flag report, and Loss control checklist—pre-shift safety meeting, etc.
12. First request for the production of documents.
13. Trigleth's answers to the first set of interrogatories and request for the production of documents.
14. Defendants' answers and affirmative defenses to the plaintiff's second amended
15. Expert written / report by Capt. Ronald Campana
16. Documents sent to Capt. Campana.
17. Copies of the deck logbook of Ocean Belt
18. Vessel's GA plan
19. Onboard measurements and photos were taken during a January 17, 2025, visit.
20. Emails from Baker and Donelson attorneys.
21. Complaint.
22. Internation Safety Management Code.
23. International Ship and Port Security Code.

FMC INTERNATIONAL

3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002

**Full CV of Capt Gajanan Karanjikar**

**CAPT. GAJANAN KARANJIKAR**

**Professional Experience:**

January 3, 2025 - Present

Senior Consultant: **FMC INTERNATIONAL, LLC:**

Areas of specialization include accidents and incidents investigations, personal injury investigations on board as well as in ports, terminals, and loading/unloading locations, vessel vetting and condition surveys, hull and machinery damage and repair surveys of ocean-going, inland, and offshore vessels, dock and offshore platform damage inspections, ISM and ISPS audits, Pre-USCG inspections of vessels.

General, break-bulk and bulk-damage inspections, loading, and discharge surveys, liquid cargoes inspections, contamination investigation and remediation, loss mitigation and verification.

October 2021 – December 2024

Managing Director, **Cordelia Marine Services LLC,** UAE

IBS class surveyor for vessel entry and renewal surveys. Panama Flag inspector and accident investigator, Certified vessel ISM/ISPS/MLC auditor, Vessel inspection, including pre-purchase inspections / Vessel condition surveyor, Cargo Damage Survey, Vessel valuations (offshore vessels), ESG auditor (Verifier and Implementor), Sustainability professional-BRSR practitioner, ISO 9000 lead auditor.

October 2016 – May 2021

Head - Coastal Shipping, Integrated Logistics Solutions, International Business Development **Sical Logistics Ltd.**

Business Head of International Business Development, Port Ops, FF. Managed dredger operations and third-party technical managers, bulk (coal) movement through spot fixtures on the Indian Coast. Responsible for operational integration of sea, rail, road, and other logistics with other verticals of port operation. Responsible for Profit & Loss of INR180 Cr.

FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002

**Achievements:**

- Developed coastal shipping initiative for uncommon cargoes on the Indian coast
- Pioneered automobile carriage through a Ro-Ro Vessel on the coast
- Increased order for transportation and port operations to INR 250 Cr.
- Extensively managed handling of port calls, stevedoring, and shore handling activities.

November 2015 - October 2016

GM - Operations, Compliance and Quality Mercator Ltd., **Mercator, Ltd**

Ensured proper interaction between the commercial/operations department and the technical department. Commercial operations of bulk carrier, post fixture towards gainful voyage. Managed managers (fleet management and V Ships) of our vessels, setting up tangible KPIs for managers. Following up on the KPIs and MIS every month.
Deciding on strategies for better operations for owners' benefit.
Ensured vessels were attended to, and issues faced by vessels were taken care of by respective departments. Ensured team has a better understanding of Charter Parties and Contracts of affreightment and the ship owner's interest/liabilities concerning the same
Ensured a process of Marine claims, Insurance, and shipowner's position regarding financial liabilities and the participant's role in protecting the owner's interests

July 2013 – November 2015

Head of Marine, Dry-docks, and projects, **Target Ship Management, Singapore. (Mercator Lines)**

Managed the dry docks for the owned fleet from start to finish (yard evaluation, finalizing specs, benchmarking budgets, approval of owners, and execution)
Built strong relationships with shipyards (Asia and the Middle East) and ensured yard compliance with contractual requirements, best payment terms, and contract drafting
Represented owners at the yard and acted as an interface between them and the class on all matters and demonstrated excellent negotiation skills
Trained the superintendents on dry docking and projects and methods for continuous improvements.

December 2011 – July 2013

Senior Manager - Technical /Operations (Reported to General Manager/President (head of ship management), **Target Ship Management, Singapore**

Monitored and streamlined day-to-day vessel technical operations
Liaised with vessel superintendents for vessel issues and follow-ups

FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002

Ensured and worked for increased cooperation between vessels and shore
Made/controlled/checked proposed technical budgets
Built a strong team through People Performance Management
Coached and supervised the superintendents in the fleet group during the daily operation of vessels
Took initiatives to improvise reporting from the vessel for effective control
Executed energy-saving initiatives for ships

August 2010 – December 2011

Senior Manager - Commercial/Voyage, **Mercator Lines Singapore Ltd.**

Conducted post-fixture operations for dry bulk carrier
Planned voyages of assigned vessels, including cargoes, fuel management, agency nominations, and operational considerations
Checked laytime calculation as per CP terms as well as CP daily yield
Assisted chartering in pre-fixture operations with questionnaires, loadable quantities, and Optimum Service Speed according to prevailing market conditions and bunker prices, ensuring compliance with various regulations and restrictions and coordinating with the Technical Manager for technical requirements
Liaised with charterers, reviewed the recap and charterer's instructions, and issued voyage-specific instructions to ships as required
Handled P&I claims for cargo, vessel, and commercial claims and provided necessary documentation and assistance to other team members for claims settlement
Procedural control through ISO system for commercial operations and chartering
Prepared, reviewed, and issued freight, dead freight, and other voyage-related invoices and monitored receipt of such payments.

August 2009 - July 2010

Technical Manager, **Mercator Lines Singapore Ltd.**

Managing the ship managers (Maersk, EPIC, Target Ship management)
Third-party technical management of fleet and reputation
Performed analysis of fleet and benchmarking expertise
Executed dry docking and lay-up repairs
Being a part of the VLOC conversion project team

**Notable Projects:**

Maritime ICON of India- awarded.
Global ambassador for sustainability.
Runner up for Diploma in Shipping and Management
Gold medallist in first year in NMIS (shipping and logistics)
ICS – International chartered ship brokers (Diploma) with distinction in Maritime Law.

FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002

**Educational Qualifications & Professional Affiliations:**

- Master Mariner, Foreign Going, issued by Govt. of India.
- Diploma in Shipping and Management from Narottam Morarji Institute of Shipping (NMIS), Mumbai.
- Fellow Company of Master Mariners
- BRSR practitioner
- ESG verifier and implementor
- ISO 9000 lead auditors.
- Sustainability Management (Cambridge University)-
- MICS (London)
- Fellow of NMIS, Mumbai

Citizenship:
Indian

Address:
3525 N Causeway Blvd. Ste. 1020 Phone: (504) 304-1932
Metairie, La 70002 (504) 982-1117
E-mail:gkaranjikar@fmc.international

FMC INTERNATIONAL
3525 N. Causeway Blvd.
Ste. 1020
Metairie, La 70002

## COMPENSATION

The fees of FMC International, LLC, are as follows and are not contingent upon the outcome of an inspection, litigation, or the determination of the trier of fact:

Fees for assistance in all legal matters: $400.00/hour (plus expenses, generally at cost)

- (Includes review of documentation, and preparation of an expert report. minimum 2-hour charge)

$500.00/hour (plus expenses, generally at cost) (For deposition testimony and testimony in court. minimum half-day charge: $2000 minimum charge)

**Retainer & Payment Terms**

- Initial retainer: **$ 3000**, due before engagement
- Payment due: **Within 15 days of invoice issuance**
- Cancellation: **Depositions/court appearances require 12 hours' notice; otherwise, a cancellation fee of $1000 applies**

Upon request, a detailed breakdown of time spent and corresponding charges will be provided.

info@fmc.international (USA)
operations@fmc.international (Global)
www.fmc.international



USA - Greece - Singapore - Italy - Cyprus - Turkey
Toll free: +1 (888)-764-3612
24 hours: +1-504-304-1932
Fax : +1-504-500-9332