UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JOSEPH TRIGLETH                                    CIVIL ACTION

VERSUS                                             NO. 23-65

OCEAN BELT MARITIME, INC., *et al.*                SECTION M (4)

**ORDER & REASONS**

Before the Court is a motion for summary judgment filed by defendants Ocean Belt
Maritime, Inc. and Ocean Longevity Shipping & Management Company, Ltd. (together,
"Defendants").[1]  Plaintiff Joseph Trigleth responds in opposition.[2]  Defendants reply in further
support of their motion,[3] and Trigleth files a surreply.[4]  Having considered the parties' memoranda,
the record, and the applicable law, the Court denies the motion in part and grants it in part.

I.    **BACKGROUND**

This longshoreman-personal-injury suit arises out of an incident on the Defendants' vessel,
the M/V *Ocean Belt* (the "Vessel").[5]  Trigleth was employed as a ship superintendent by non-party
Cooper Consolidated LLC ("Cooper"), which was contracted to unload cargo from the Vessel at
Cooper's terminal on the Mississippi River in LaPlace, Louisiana, in January 2021.[6]  Trigleth
alleges that, while he was overseeing cargo unloading operations on the night of January 29, 2021,
he "sustain[ed] severe and disabling injuries when he tripped and fell over a dolly of safety rail
pipes which were in [his] path as he crossed [some] steps" on the deck of the Vessel.[7]  Trigleth

---

[1] R. Doc. 37.
[2] R. Doc. 38.
[3] R. Doc. 41.
[4] R. Doc. 45.
[5] R. Doc. 20 at 2.
[6] *Id.*; R. Docs. 37-1 at 3; 38 at 10.
[7] R. Doc. 20 at 3.  The steps led to an equipment-crossover walkway.

brought this action on January 6, 2023, asserting negligence claims against Defendants under § 905 of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 905.[8] Defendants now move for summary judgment.[9]

## II.    PENDING MOTION

In their motion for summary judgment, Defendants argue that they "did not breach any of the three narrow '*Scindia* duties'" owed by vessel owners to longshoremen, and that Trigleth has no evidence to support his negligence claims.[10]  Defendants first contend that the turnover duty under *Scindia* is not at issue in this case because Trigleth admits that the pipe-laden dolly was not present in the area of the accident in the days between January 25, 2021, when Defendants turned the Vessel over to Cooper, and Trigleth's accident on January 29, 2021, and thus, Defendants could not have known of their location at the time of turnover.[11]  Defendants further argue that "a 3-4' tall rolling dolly with pipes on the deck" would have been an open-and-obvious condition of which they would have had no duty to warn the stevedore crew.[12]  Defendants next argue that they did not have active control over the area where the accident occurred because none of the Vessel's crew was in that area during Cooper's cargo operations that night.[13]  Defendants then contend that they did not violate their duty to intervene under *Scindia* because they lacked actual knowledge of the alleged location of the dolly and pipes at the time of the accident or that their presence there created a hazard.[14]  Lastly, Defendants assert that Trigleth has no evidence to support his allegation that any dolly loaded with pipes was positioned near the steps at the time of the accident,[15] and

---

[8] R. Doc. 1.

[9] R. Doc. 37.

[10] R. Doc. 37-1 at 1-2 (quote at 1) (referencing *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981)).  These duties are discussed at § III(B), *infra.*

[11] *Id.* at 10-11.

[12] *Id.* at 11.

[13] *Id.* at 11-15.

[14] *Id.* at 15-19.

[15] *Id.* at 19-23.

point out that, although Trigleth was responsible for photographing cargo operations as acting surveyor on January 29, 2021, he "did not take a single picture of the dolly or pipes that night."[16]

In his opposition, Trigleth first contends that "there are two issues of contract, positive law or custom which suggest that *Scindia*'s limitations upon the shipowners' duties do not apply in this case,"[17] namely, Cooper's "Ship Mooring Terminal Tariff for Locations on the Lower Mississippi River" (the "Tariff")[18] – by which, says Trigleth, Defendants "contractually modified the limited duties set forth in *Scindia*"[19] – and the International Safety Management Code ("ISM Code") which Trigleth asserts applies to Defendants as vessel owners.[20]  Trigleth then argues that, "[i]nsofar as *Scindia* may apply to this matter," Defendants breached the turnover and active-control duties.[21]  He contends that the Vessel was turned over to Cooper with insufficient lighting for him to safely perform his duties on the deck, in breach of Defendants' turnover duty.[22]  As to the active-control duty, Trigleth argues that the dolly and pipes he allegedly tripped on were "under the exclusive control of the [V]essel" at the time of his accident.[23]  He asserts that, because the dolly and pipes were part of the Vessel's equipment, had not been moved by anyone on the stevedore crew, and were not present in the area prior to his accident, only the Vessel crew, who were supposed to be making rounds on the Vessel that evening, "could have moved the dolly into the position it was in at the time of the accident."[24]

---

[16] *Id.* at 21 (emphasis omitted).
[17] R. Doc. 38 at 7.
[18] R. Doc. 38-11.
[19] R. Doc. 38 at 8-12 (quote at 11).
[20] *Id.* at 12-15.
[21] *Id.* at 15.
[22] *Id.* at 15-17.
[23] *Id.* at 18.
[24] *Id.* at 18-24 (quote at 19).

In their surreply, Defendants first argue that § 905(b) is Trigleth's exclusive remedy against Defendants and that neither the Tariff nor the ISM Code modify their duties under *Scindia*.[25] Defendants assert that the Tariff provision Trigleth cites is meant to be read as an indemnity clause and "[s]imilar arguments, under much more specific and tailored contracts and charter party agreements, have been rejected by courts again and again."[26]  Defendants also contend that case law does not support Trigleth's argument that the ISM Code affects their duties under *Scindia* and § 905(b).[27]  Defendants then argue that Trigleth has not identified an issue of material fact as to whether they breached their *Scindia* duties.  As to Trigleth's turnover-duty argument, Defendants contend that Trigleth's March 25, 2025 affidavit, submitted with his opposition, in which he asserts that the area of the Vessel where he was injured was "not illuminated" is a sham affidavit because it is "in direct conflict with his sworn deposition testimony that the lighting was 'adequate that night for what he was doing on the ship'" and that he had no "'issues walking around the [V]essel because it wasn't well-lit that night.'"[28]  With respect to Trigleth's argument that Defendants had active control of the dolly and pipes at the time of the accident, Defendants assert that, even accepting the statements in the affidavit as true, Trigleth's theory of the case requires the Court to draw "inferences upon inferences," which "is not proper or appropriate to create an issue of fact."[29]

In his surreply, Trigleth contends that he "only asked the Court to draw one inference: that 'the overwhelming weight of the evidence makes it reasonable to make the inference that only the crew of the [Vessel] could have moved the dolly and had access to the dolly and the pipes/stanchions which hung over the step on the cross-over and caused [his] accident.'"[30]  Trigleth

---

[25] R. Doc. 41 at 1.
[26] *Id.* at 2-3 (quote at 3).
[27] *Id.* at 3-4.
[28] *Id.* at 4-5 (quote at 5) (alteration omitted) (quoting R. Doc. 37-5 at 188-89).
[29] *Id.* at 9-10 (quote at 9).
[30] R. Doc. 45 at 2-3.

also denies that his March 25 affidavit is a sham affidavit because it "merely supplements his testimony and also addresses facts he was not asked about," and the discrepancies between his statements during his deposition and in the affidavit are reconcilable.[31]

## III.    LAW & ANALYSIS

### A.  Summary-Judgment Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id.* at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id.* at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The substantive law identifies which facts are material. *Id.* Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *EEOC*

---

[31] *Id.* at 4-5 (quote at 4).

*v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).   Unsubstantiated assertions, conclusory allegations, and merely colorable factual bases are insufficient to defeat a motion for summary judgment.  *See Anderson*, 477 U.S. at 249-50; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994).   In ruling on a summary-judgment motion, a court may not resolve credibility issues or weigh evidence.  *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).  Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment.  *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001).  Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."  *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must articulate specific facts showing a genuine issue and point to supporting, competent evidence that may be presented in a form admissible at trial.  *See Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A), (c)(2).  Such facts must create more than "some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary-judgment burden.  *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(1)(B).  Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted.  *See Little*, 37 F.3d at 1075-76.

## B. *Scindia* Applicability

The LHWCA allows longshoremen to bring negligence claims against vessel owners.  33 U.S.C. § 905(b); *Aguilar v. Bollinger Shipyards, Inc*., 833 F. Supp. 2d 582, 591 (E.D. La. 2011).  "As a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards."  *Scindia*, 451 U.S. at 170.  However, in *Scindia*, the Supreme Court identified three general duties owed by shipowners to longshoremen:

> The first, which courts have come to call the "turnover duty," relates to the condition of the ship upon the commencement of stevedoring operations.  The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel."  The third duty, called the "duty to intervene," concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore.

*Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 98 (1994) (quoting *Scindia*, 451 U.S. at 167-68) (internal citations omitted).  The Court in *Scindia* noted that, "[a]lthough the shipowner does not have a general duty to supervise the stevedore's work, such a duty may arise if it is imposed by contract or custom."  *Broxson v. Samedan Oil Corp.*, 1993 WL 302659, at *1 (E.D. La. Aug. 5, 1993) (citing *Hill v. Texaco, Inc.,* 674 F.2d 447 (5th Cir.1982)); *see Scindia*, 451 U.S. at 172 ("We are of the view that absent contract provision, positive law, or custom to the contrary – none of which has been cited to us in this case – the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore.").

### 1.  Contract Exception

"As a general rule, admiralty law applies to all maritime contracts."  1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 5:1 (6th ed. 2018) (citing *Aqua-Marine Constructors, Inc. v. Banks*, 110 F.3d 663, 670 (9th Cir. 1997)).  "The general maritime law is the

product of the maritime jurisprudence of the federal courts" and "'is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules'" that are "'[d]rawn from state and federal sources.'" *Id.* (quoting *E. River S.S. Corp. v. Transam. Delaval, Inc.*, 476 U.S. 858, 864-65 (1986)). Applying federal law in the context of maritime contracts "'includes looking to principles of general contract law that can be found in treatises or restatements of the law.'" *Int'l Marine, L.L.C. v. FDT, L.L.C.*, 619 F. App'x 342, 349 (5th Cir. 2015) (quoting *Univ. of Tex. Sys. v. United States*, 759 F.3d 437, 443 (5th Cir. 2014)) (internal quotation marks omitted).

A contract is formed when at least two parties with the legal capacity to contract manifest mutual assent to a bargained-for exchange of consideration. RESTATEMENT (SECOND) OF CONTRACTS §§ 9, 12, 18 & 71 (AM. L. INST. 1981). "[T]he manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties." *Id.* § 22(1). "Acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer," which can include acceptance by performance that operates as a return promise. *Id.* § 50. However, "[a] manifestation of mutual assent may be made even though neither offer nor acceptance can be identified and even though the moment of formation cannot be determined." *Id.* § 22(2). Assent may be given in writing, orally, by the performance of other acts, or by the failure to act. *Id.* § 19(1). A party's conduct is effective as a manifestation of his assent if "he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Id.* § 19(2).

Under both general contract principles and maritime law, "where a contract expressly refers to and incorporates another instrument in specific terms which show a clear intent to incorporate that instrument into the contract, both instruments are to be construed together." *One Beacon Ins.*

*Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 267 (5th Cir. 2011) (citing 11 WILLISTON ON CONTRACTS § 30:25 (4th ed. 1999)).  A document referenced in a contract "will become part of the contract where the contract makes 'clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt.'"  *Id.* at 268 (quoting WILLISTON, *supra*, § 30:25).  "Terms incorporated by reference will be valid so long as it is 'clear that the parties to the agreement had knowledge of and assented to the incorporated terms.'"  *Id.* (quoting WILLISTON, *supra*, § 30:25).  "Notice of incorporated terms is reasonable where, under the particular facts of the case, 'a reasonably prudent person should have seen' them."  *Id.* (alteration omitted) (quoting *Coastal Iron Works, Inc. v. Petty Ray Geophysical*, 783 F.2d 577, 582 (5th Cir. 1986)).

Trigleth argues that Defendants and Cooper "contractually modified the limited duties set forth in *Scindia* … which the Court in *Scindia* anticipated could occur."[32]  Specifically, Trigleth points to section V(4) of the Tariff which states in full:

> *The Vessel shall inspect and supervise, continuously, all Vessel movement and all cargo loading or unloading operations and shall be in charge thereof.*  The Vessel shall have sole responsibility for any damage, loss or injury to property or persons resulting therefrom, and the Vessel shall defend, indemnify and hold [Cooper] harmless from and against any and all such damage, loss or injury, regardless of the cause or causes thereof and even to the extent caused by the negligence or other fault of [Cooper].[33]

According to Trigleth,[34] this is "exactly" the type of contractual provision contemplated by the *Scindia* Court when it noted that "absent contract provision ... to the contrary … the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to

---

[32] R. Doc. 38 at 11.
[33] R. Doc. 38-11 at 6 (emphasis added).  Plaintiffs discuss only the italicized text in their opposition to the motion for summary judgment.  *See* R. Doc. 38 at 11.
[34] *Id.* (quoting *Scindia*, 451 U.S. at 172).

the stevedore." *Scindia*, 451 U.S. at 172.  However, the Tariff in and of itself is not a contract.

Instead, as explained in section III of the Tariff:

> Anyone desiring to moor a [v]essel at [one of Cooper's mid-stream ship mooring buoys] must file a completed [b]erth [a]pplication ("Application") with [Cooper] that complies with the requirements of this Tariff. … *The Application, when accepted by [Cooper], shall constitute the contract between [Cooper] and the [v]essel based on the terms of this Tariff.*  Submission of a [b]erth [a]pplication constitutes conclusive evidence of the [v]essel's agreement to be bound by the terms, rates, rules and regulations set forth herein.[35]

Trigleth included a copy of the Tariff with his opposition, but not the Application.  Defendants do

not raise the lack of evidence of the Application in their reply,[36] but argue that the cited provision

"should be read as an indemnity clause,"[37] which, they say, courts have consistently held do not

modify vessel owners' *Scindia* duties.[38]  However, the Court cannot begin to interpret a provision

of the Tariff without sufficient evidence that Cooper and Defendants mutually assented to it.

    A berth application that "clearly and expressly" incorporates the terms of a tariff may be

enforceable against a vessel owner.  *Cargill, Inc. v. Kopalnia Rydultowy Motor Vessel*, 304 F.

App'x 278, 281-82 (5th Cir. 2008); *but see Armit v. Eleni Int'l Shipping, S.A.*, 201 F.3d 556, 558

(5th Cir. 2000) (holding that indemnification provision of a tariff incorporated by reference into a

berth application was unenforceable against a non-signatory vessel owner where the vessel

charterer's agent, who signed the application, lacked actual or apparent authority to bind the vessel

owner).  But evidence of a tariff alone is not enough.  There must be a contract between the terminal

(here, Cooper) and the vessel owner or its authorized agent incorporating the terms of the tariff for

---

[35] R. Doc. 38-11 at 3 (emphasis added).  The term "vessel" as used in this provision includes vessel owners and operators, such as Defendants here, as well as the vessel's "manager, charterer, master and agents."  *Id.*

[36] Defendants implicitly deny that an agent of the Vessel signed the Tariff in a footnote asserting that, "to the extent Cooper did impose additional obligations on the Vessel beyond *Scindia*, they are identified in the attached Exhibit A, 'Prevention of Accidents' form that the Vessel's Chief Officer *actually signed*."  R. Doc. 41 at 3 n.11 (emphasis added) (citing R. Doc. 41-1 at 1).

[37] *Id.* at 2.

[38] *Id.* at 3.

those terms to be enforceable against the vessel.  *Bunge Corp. v. M/V Mount Eden*, 1983 WL 591, at *1 (E.D. La. Sept. 16, 1983) ("Preliminarily, it is noted that what [the terminal operator] refers to as its 'tariff' is not enforceable absent contractual assumption of its provisions by the ship or the ship's agent.").  Here, without proof that Defendants signed the Application – or some other contract – which clearly incorporates the terms of the Tariff, there is no evidence that Defendants agreed to the cited provision.[39]  The Court will not consider whether Defendants contractually expanded the well-established, limited duties normally owed by vessel owners to longshoremen under *Scindia* based on the mere assumption that such a contract exists.

In any event, neither party has provided a sufficient basis for the Court to resolve this issue. In support of his argument that Defendants contractually assumed duties beyond their limited *Scindia* duties, Trigleth cites only the *Scindia* Court's caveat that a contract, statute, or custom might impose on vessel owners a duty to inspect or supervise cargo operations.  He has identified no case applying this contract exception – much less any case where a vessel owner was found to have contractually assumed additional duties to longshoremen.  And while Defendants point to a few authorities in support of their argument that "[s]imilar arguments … have been rejected by courts again and again,"[40] the contract cases cited by Defendants arise out of charter parties,[41] not

---

[39] Knowledge of "mandatory" tariff provisions, which relate to rates and charges and are required to be published by law, is imputed to vessel owners.  The provision at issue here is non-mandatory, as it does not relate to rates and charges.  Thus, even if the Tariff is published, Defendants are not charged with constructive knowledge of this term.  *See Marvirazon Compania Naviera, S.A. v. H. J. Baker & Bros.*, 674 F.2d 364, 366 nn.1-2 (5th Cir. 1982).

[40] R. Doc. 41 at 3.

[41] *Id.* at 2 n.7 (citing *Sobrino-Barrera v. Anderson Shipping Co.*, 495 F. App'x 430, 435 (5th Cir. 2012) (holding that charter party provision requiring charterer to "load, stow, trim, discharge, lash, secure, dunnage and unlash the cargo" was an indemnification clause between the owner and charterer which did not impose on the owner additional duties owed to longshoremen); *Robinson v. Orient Marine Co.*, 505 F.3d 364, 366 (5th Cir. 2007) (holding that time-charter clause stating that "[c]harterers are to [p]erform all cargo handling at their risk and expense" shifted liability to charterer, but did not alter or expand *Scindia* duties otherwise owed to injured longshoreman)), 3 n.10 (citing *Goldsmith v. Swan Reefer A.S.*, 173 F. App'x 983, 987 (3d Cir. 2006) (holding that time charter between vessel and terminal operator requiring vessel to have an officer on deck to "prevent any pilferage or misconduct to the cargo and also watch, supervise and secure proper handling and/or stowing of the cargo" did not impose a duty on the vessel to safeguard longshoremen handling cargo); *Mullen v. Alicante Carrier Shipping Corp.*, 2004 WL 1737493, at *7 (E.D. Pa. Aug. 3, 2004) (holding that same clause as in *Goldsmith* did not alter vessel's duties to longshoremen)).  The

contracts between the vessel owner *and the stevedore*, as the Application in question here would be. Courts declining to hold that a charter party provision modifies a vessel owner's duties to longshoremen have noted this distinction. *See Sobrino-Barrera v. Anderson Shipping Co.*, 2011 WL 5245396, at *8 (S.D. Tex. Oct. 24, 2011) ("[T]he Supreme Court in *Scindia* noted that it 'may also be that the contract between the stevedore and the shipowner will have provisions specifically bearing on the dispute.' However, as noted, the contract upon which [the p]laintiff relies is a [t]ime [c]harter between the owners of the [vessel] and [the charterer]'s subcharterer, *not* between [the charterer] and the stevedore." (internal citation and footnote omitted; emphasis in original)), *aff'd*, 495 F. App'x 430; *Mankus v. Swan Reefer I,* 2003 U.S. Dist. LEXIS 10263, at *35 (E.D. Pa. May 20, 2003) ("[T]he *Scindia* Court's contract exception is logically interpreted to be premised on the Court's envisioning contract provisions between the stevedore and shipowner …."); *Mullen*, 2004 WL 1737493, at *7. Defendants do not address this difference between the purported Application and the cited cases.[42]

Some courts suggest that an injured longshoreman seeking to enforce a supposed contractual duty against a vessel must show that he was an intended beneficiary of the relevant contract. *See Goldsmith*, 173 F. App'x at 987-88 (holding that vessel owner owed no duty to longshoreman under time-charter agreement between terminal operator and vessel owner that

---

other cases cited by Defendants are not based on contracts. *Id.* at 3 n.10 (citing *Jones v. Sanko S.S. Co.*, 148 F. Supp. 3d 374, 391 (D.N.J. 2015) (rejecting assertion that vessel's internal safety management system created custom or contractual obligation to supervise stevedores' cargo operations); *Derr v. Kawasaki Kisen K.K.*, 835 F.2d 490, 493 (3d Cir. 1987) (rejecting attempt to restate as a custom the general duty to inspect cargo rejected in *Scindia*)).

[42] In addition, both of the cases Defendants cite in support of their argument that the provision should be read as an indemnity clause, *id.* at 2 n.7 (citing *Sobrino-Barrera*, 495 F. App'x at 435, and *Robinson*, 505 F.3d at 366), involve variations of Clause 8 of the New York Produce Exchange Form, a standardized charter party form used in the shipping industry. *See* Edward C. Hammond, *Time Charterers, the New York Produce Exchange Form, and Personal Injury Liability*, 12 TUL. MAR. L.J. 185, 186 (1987). "Three circuit courts, including the Fifth Circuit, have held that a clause in a charter party agreement nearly identical to [Clause 8] 'acts as an indemnification clause between the owner and the time charterer and does not affect the duties owed to longshoremen.'" *Poole v. Gorthon Lines AB*, 908 F. Supp. 2d 778, 791 (W.D. La. 2012). There is no similar history of widespread use and judicial interpretation of clauses like the one at issue here.

required the vessel "to have an officer on deck during loading and discharging, to 'prevent any pilferage or misconduct to the cargo and also watch, supervise and secure proper handling and/or stowing of the cargo'" because that provision "appear[red] enacted for the benefit of the cargo," not the longshoreman); *Mankus,* 2003 U.S. Dist. LEXIS 10263, at *35 ("[T]he *Scindia* Court's contract exception is logically interpreted to be premised on the Court's envisioning contract provisions between the stevedore and shipowner, *provisions that specifically address the dangerousness of conditions that the longshore workers might encounter during their stevedoring operations*." (emphasis added)).  Trigleth is not a party to the purported Application and the Tariff provision makes no reference to longshoremen and their safety.  Thus, even if Defendants assumed a duty to Cooper to "inspect and supervise" and "be in charge" of cargo operations, it does not necessarily follow that such a duty makes Defendants liable to Trigleth for any injuries he sustained in performing his work.  *See Mankus*, 2003 U.S. Dist. LEXIS 10263, at *34-35 ("[T]he fact that the shipowner is contractually obligated to the charterer to supervise the handling of the latter's cargo to prevent damage or looting, does not reimpose a general supervision duty owed to the stevedoring operation for the purposes of liability for a longshore worker's physical injuries.").

Nevertheless, while the Tariff provision invoked by Trigleth here does not explicitly relate to longshoremen's safety, it does plainly state that the Vessel "shall inspect and supervise … all cargo loading or unloading operations,"[43] using the same language that the *Scindia* Court used in describing the duty vessels generally do not owe longshoremen "absent contract provision." *Scindia*, 451 U.S. at 172 ("We are of the view that absent contract provision, … the shipowner … owes no duty to the longshoremen to *inspect or supervise the cargo operations*." (emphasis added)).  Neither party has identified any case interpreting a similar provision and the Court has

---

[43] R. Doc. 38-11 at 6.

found none.  Defendants' interpretation of the entire provision solely "as an indemnity clause" [44] would render this language superfluous.  On the other hand, if the provision is as sweeping as Trigleth suggests, it would place vessels "in charge" of "all cargo loading or unloading operations" and subject Cooper's stevedores to vessels' continuous supervision and inspection of same.  It is doubtful that Cooper, which is in the business of stevedoring, intended to relinquish virtually all control of cargo operations to every vessel using its terminals.  Alternatively, the provision could be read to impose on a vessel using Cooper's terminals a duty to "supervise and inspect" cargo operations insofar as those operations relate to "vessel movement" – which would fall within the ambit of a vessel's ordinary responsibilities.  *See Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 802 (5th Cir. 1977) ("Those in control of the vessel's navigation must bear the greater responsibility for bringing their ship safely into and out of port.").  While the broader interpretation of the provision could be said to impose a duty on Defendants to supervise and inspect Cooper's operations on the night of Trigleth's accident, the latter would not.  But the Court need not address this question now because Trigleth has not established that a contract existed.

Regardless, even if the Court could hold that Defendants owed Trigleth a contractually assumed duty to "inspect and supervise" all cargo operations, this still would not end the Court's inquiry.  Trigleth has not established that Defendants' compliance with this purported duty would have prevented his accident.  *See Mankus*, 2003 U.S. Dist. LEXIS 10263, at *37; *Mullen*, 2004 WL 1737493, at *7.  In sum, because there are open issues of material fact as to whether any contract incorporating the Tariff was formed between Cooper and Defendants, the Court cannot consider the effect of the Tariff provision, and, even if it could, the foregoing questions regarding

---

[44] R. Doc. 41 at 2.

the application of the cited Tariff provision would preclude judgment as a matter of law on this issue.

### 2. Positive Law Exception

Trigleth also contends "that the applicability of the ISM [Code] creates a question of fact and/or law as to whether the ISM is a 'contract provision, positive law, or custom' which displaces the limited duties created by *Scindia*."[45]  Trigleth relies on a case from this district in which a longshoreman-plaintiff argued that the defendants, a voyage charterer and vessel owners, violated the ISM Code and breached their turnover duty under *Scindia*.[46]  In granting the voyage charterer's motion for summary judgment, the court in that case held that the ISM Code was inapplicable to voyage charterers, because "the entities regulated by the ISM Code are either 'vessels' or 'companies.'"  *Clements*, 2007 WL 9778107, at *4.  Accordingly, the court deemed the plaintiffs' ISM-Code argument, at least as to the voyage-charterer defendant, "frivolous."  *Id.*  Trigleth argues that, "by the reasoning set forth by [the *Clements* court], the ISM Code applies to owners and managers such as the defendants herein."[47]  While it may be true that the ISM Code generally applies to vessel owners, it does not follow that its requirements supplant a vessel's *Scindia* duties. This argument was not addressed in the *Clements* decision upon which Trigleth relies.[48]

Moreover, as Defendants point out, the federal courts that have considered whether the ISM Code alters vessels' duties to longshoremen have uniformly held that it does not.  *See Horton v. Maersk Line, Ltd.*, 603 F. App'x 791, 796-97 (11th Cir. 2015) (rejecting the ISM Code as a basis for a negligence claim in excess of that permitted under the LHWCA and *Scindia*); *Provence v.*

---

[45] R. Doc. 38 at 14-15.
[46] *Id.* at 12-15 (citing *Clements v. Quark, Ltd.*, 2007 WL 9778107, at *1 (E.D. La. Apr. 10, 2007)).
[47] *Id.* at 14.
[48] But, in a separate order and reasons, the *Clements* court applied *Scindia* in denying the vessel owners' motion for summary judgment, *Clements v. Quark, Ltd.*, 2007 WL 1087499, at *1-2 (E.D. La. Apr. 10, 2007), thereby undermining the point Trigleth attempts to make with this case.

*United States*, 661 F. Supp. 3d 459, 465 n.3 (D.S.C. 2023) ("Numerous courts have held that the [Safety Management System] requirements imposed by the ISM Code do not affect a vessel operator's negligence liability."); *Jones*, 148 F. Supp. 3d at 392 n.39 ("Few courts have addressed whether the ISM Code, as codified, creates duties running from vessels to longshoremen in excess of those set out in the LHWCA.  Nevertheless, every federal court that has addressed this issue has concluded that it does not.") (collecting cases).  Thus, while there may not be relevant case law addressing this issue from this circuit, the consensus among other federal courts that have is that the ISM Code does not impose duties on vessel owners in place of, or in addition to, the *Scindia* duties.  Because Trigleth has not identified any authority to the contrary, the Court holds as a matter of law that the ISM Code does not "displace" vessel owners' well-established duties to longshoremen under *Scindia*.

## C.  *Scindia* Duties

Because there is insufficient evidence on the record to determine whether Defendants have contractually assumed additional duties to Trigleth,[49] the Court is not precluded from considering whether Defendants have met their summary-judgment burden with respect to the two *Scindia* duties Trigleth contests in this case: the turnover duty and the active-control duty.

### 1.  Turnover

The turnover duty can be separated into two duties: "(1) 'a duty to exercise ordinary care under the circumstances to turn over the ship and its equipment in such condition that an expert stevedore can carry on stevedoring operations with reasonable safety,' and (2) 'a duty to warn the stevedore of latent or hidden dangers which are known to the vessel owner or should have been known to it.'"  *Sobrino-Barrera*, 495 F. App'x at 434 (quoting *Kirksey v. Tonghai Mar.*, 535 F.3d

---

[49] *See supra* § III(B)(1).

388, 392 (5th Cir. 2008)).  The vessel owner's duty extends only to "hazards that would be neither obvious to nor anticipated by a competent stevedore in the ordinary course of cargo operations." *Howlett*, 512 U.S. at 99.  Even then, the vessel owner must have actual knowledge of the defect or is imputed with knowledge "if the exercise of reasonable care would place upon the shipowner an obligation to inspect for, or discover, the hazard's existence." *Id.* at 100.  "If obvious, [the defect] should have been as apparent to the stevedore as to the shipowner.  It is contradictory to suggest that a careful shipowner should discover an apparent defect but that a careful stevedore may miss it with impunity."  *Morris v. Compagnie Mar. Des Chargeurs Reunis, S.A.*, 832 F.2d 67, 69-70 (5th Cir. 1987).

Trigleth, relying on his March 25 affidavit, argues that Defendants breached the turnover duty by failing to provide sufficient lighting in the area where he fell.[50]  Defendants argue that the affidavit is a sham because it is "in direct conflict with his [prior] sworn deposition testimony,"[51] but, even if the Court considers the affidavit, Trigleth "still cannot identify any *Scindia* duty that Defendants may have breached" by failing to provide adequate lighting on the deck.[52]  While the Court agrees with Trigleth that the affidavit "merely supplements his testimony and also addresses facts he was not asked about" during his deposition,[53] it nevertheless holds as a matter of law that

---

[50] R. Doc. 38 at 17.

[51] R. Doc. 41 at 5.

[52] *Id.* at 4-5 (quote at 5).

[53] R. Doc. 45 at 4.  Trigleth's testimony that the lighting was "adequate" for Cooper's night operations, R. Doc. 37-5 at 187-88, can be reconciled with his statement that the area of the deck where he fell was inadequately lit, R. Doc. 38-3 at 4, as he has explained in the affidavit that he deemed the lighting to be adequate for certain of Cooper's operations – the unloading of the cargo from the holds – which did not take place in the same area as Trigleth's accident. *Id.*  And the descriptions in the affidavit of the various sources of light and how they did or did not illuminate the deck also supplement Trigleth's testimony, which only pertained to the adequacy of lighting in general.  *Compare* Doc. 37-5 at 187-88, *with* R. Doc. 38-3 at 4-5.  While Trigleth's testimony denying that he had "any issues walking around the [V]essel because it wasn't well-lit that night," R. Doc. 37-5 at 188, may undermine his theory that poor lighting "was a contributing factor to his accident," R. Doc. 38 at 17, nothing in the affidavit directly contradicts this testimony, and, in any event, the Court holds that Defendants are entitled to summary judgment on Trigleth's turnover-duty claim even taking the contents of the affidavit into account.

Defendants did not breach the turnover duty by allegedly providing inadequate lighting in the area where Trigleth was working on the night of the accident.

The Fifth Circuit does not recognize a general duty owed by vessels to provide adequate lighting to longshoremen because "maintaining adequate lighting during cargo operations is the responsibility of the stevedore." *Dow v. Oldendorff Carriers GMBH & Co.*, 387 F. App'x 504, 506-07 (5th Cir. 2010) (collecting cases); *see also Kitchens v. Stolt Tankers B.V.*, 657 F. App'x 248, 252 (5th Cir. 2016); *Alvarado v. Briese Schiffahrts GmbH & Co. KG MS Sapphire*, 750 F. Supp. 3d 778, 784 (S.D. Tex. 2024) ("The responsibility for lighting in the workplace and/or pointing out latent defects or unreasonably dangerous equipment is the responsibility of the stevedore, not the shipowner."). Therefore, "in the absence of an agreement to the contrary," *Kitchens*, 657 F. App'x at 251, Cooper, not Defendants, had a duty to provide adequate lighting for its stevedoring operations on the Vessel. Trigleth has offered no evidence of any agreement to transfer this responsibility from Cooper to Defendants. Defendants, however, have identified a "'Prevention of Accidents' form" which they assert should establish any additional duties "to the extent Cooper did impose additional obligations on the Vessel beyond *Scindia*."[54] This document states that it "is the vessel[']s responsibility" to ensure that "[d]uring the hours of darkness," the gangways are "suitably illuminated" and, in a section titled "Hold Lighting," that "[d]uring the hours of darkness, while the vessel is being trimmed or a separation is being laid, the vessel must provide efficient lighting either by permanent, portable, or a combination of both lighting systems" with "[a] minimum of four portable lights or equivalent … required *in the said holds*."[55] These provisions only require that vessels "suitably illuminate[]" gangways and "provid[e] efficient lighting" in the holds for certain procedures (trimming and laying separations). Neither pertains

---

[54] R. Doc. 41 at 3 (citing R. Doc. 41-1 at 1).
[55] *Id.* (emphasis added).

to the lighting on the deck.  Therefore, Defendants had no duty, under *Scindia* or by agreement, to provide adequate lighting in the area where Trigleth was working and fell.

       Moreover, the "turnover duty is not violated if the alleged danger is 'open and obvious' or if it is a danger that 'a reasonably competent stevedore should anticipate encountering.'"  *Danos v. Union Carbide Corp.*, 541 F. App'x 464, 466 (5th Cir. 2013) (quoting *Kirksey*, 535 F.3d at 392). That the open deck of the Vessel was not fully illuminated at night is an "obvious" condition and should have been "anticipated by a competent stevedore in the ordinary course of cargo operations."  *Howlett*, 512 U.S. at 99; *see Hamilton v. Targa Transp. LLC*, 2018 WL 2010294, at *4 (S.D. Tex. Apr. 30, 2018) ("Any absence or lack of lighting on the [vessel]'s open deck at night undoubtedly is an open and obvious condition [which] cannot serve as a basis for a breach of the turnover duty.") (noting that the plaintiff testified that he had "'adequate light' to see what he was doing while working," that "all of the potentially relevant stevedoring activities" including the plaintiff's "took place at night," and that the "accident occurred on an open deck"); *see also Gable v. Klaipeda Transp. Fleet, Ltd.*, 2006 WL 1972238, at *5 (S.D. Miss. July 12, 2006) ("Plaintiff's allegations that the vessel's poor lighting was a latent hazard is subject to the open and obvious defense.  Plaintiff fails to present any evidence tending to show that the light in hold No. 2 was a latent hazard that was any more apparent to the vessel owner than the stevedore or the workers within the cargo hold." (internal citation omitted) (citing *Clay v. Daiichi Shipping*, 74 F. Supp. 2d 665, 672 (E.D. La. 1999)).  Trigleth does not argue that the lack of lighting on the deck of the Vessel was a latent condition more apparent to Defendants than to him, nor could he.  Thus, Defendants did not breach the turnover duty by purportedly failing to provide adequate lighting for this additional reason.

In short, because Defendants owed no duty to provide lighting on the deck where Trigleth's accident happened, and any lack of lighting would have been an open-and-obvious condition, Defendants are entitled to summary judgment on Trigleth's turnover-duty claim.

### 2. Active Control

The active-control duty imputes liability on vessel owners "for injury caused by hazards under the control of the ship." *Singleton v. Guangzhou Ocean Shipping Co.*, 79 F.3d 26, 28 (5th Cir. 1996). "This duty recognizes that although a vessel owner no longer retains the primary responsibility for safety in a work area turned over to an independent contractor, no such cession results as relates to areas or equipment over which the vessel's crew retains operational control." *Manuel v. Cameron Offshore Boats, Inc.*, 103 F.3d 31, 34 (5th Cir. 1997). Therefore, "[i]f the vessel relinquishes control over an area or a piece of equipment to the stevedore the duty is extinguished." *Moore v. M/V ANGELA*, 353 F.3d 376, 391 n.3 (5th Cir. 2003) (citing *Pimental v. LTD Canadian Pac. Bul*, 965 F.2d 13, 16 (5th Cir. 1992)). "To determine whether a vessel owner retains active control over an area, this court generally considers whether the area in question is within the contractor's work area, whether the work area has been turned over to the contractor, and whether the vessel owner controls the methods and operative details of the stevedore's work." *Dow*, 387 F. App'x at 507. "[T]he mere presence of vessel employees is not necessarily indicative of active control." *Manson Gulf, L.L.C. v. Mod. Am. Recycling Serv., Inc.*, 878 F.3d 130, 135 (5th Cir. 2017).

Each party points to the absence of evidence of their own responsibility for the placement of the pipe-laden dolly near the cross-over steps and asks the Court to infer that the other therefore must have done so. Defendants argue that they could not have breached their active-control duty because Trigleth testified during his deposition that, in the hours leading up to the accident, he did

not see any crew in the area where he was working and fell.[56]  Trigleth counters that, because the dolly was not present at the location of his accident earlier in his shift, neither he nor the only other Cooper employee on the deck moved the dolly to that location, and none of the Cooper employees would have had access to where the dolly or pipes were stored, "the only persons who were present and could have moved the dolly into the position it was in at the time of the accident [were] the ship's crew," which, per the Vessel's visitor log, "was on the deck making rounds during the cargo operations."[57]  Defendants contend that this "theory requires inferences built on other inferences that cannot create a question of genuine material fact."[58]

While Trigleth has offered no evidence affirmatively showing that the Vessel's crew moved the dolly or pipes, there is evidence tending to show that it was unlikely that Cooper's longshore crew would have moved them.[59]  Defendants admit that the dolly and pipes were the Vessel's equipment and do not deny that they had not been relinquished to Cooper's crew.[60]  However, they do not explain where the dolly and pipes should have been stored while not in use, or how or why anyone on Cooper's crew would have removed them from that location.  Nor do Defendants offer any other alternative theory for how the dolly loaded with pipes ended up near the steps where Trigleth was working that night.  They only present evidence that Trigleth "did not see any [Vessel] crew in the area where he was working and fell the 2.5 hours before the

---

[56] R. Doc. 37-1 at 11-15 (citing R. Doc. 37-5 at 173).

[57] R. Doc. 38 at 19.

[58] R. Doc. 41 at 10.

[59] Trigleth states in his affidavit that the dolly and pipes were not Cooper's equipment, neither he nor the only other Cooper employee on the deck during cargo-discharging operations moved the dolly, he did not know where the dolly or pipes would have been stored, none of Cooper's crew would have had access to wherever they were stored, and the Cooper crew did not need the dolly or pipes.  R. Doc. 38-3 at 1-3.  He testified during his deposition that the pipes on the dolly were used as safety rails on open holds and that Cooper's crew "do[es]n't touch them at all," R. Doc. 37-5 at 222, because they are installed by the ship's crew if requested by himself or the flagger. *Id.* at 210-212.  He further testified that he did not request that the pipes be installed that night because the flagger he was working with "doesn't work on open holds [because] he is scared of heights." *Id.* at 211.

[60] R. Doc. 41 at 6 n.21 ("Defendants do not dispute that the dolly and pipes belonged to the [V]essel and have never suggested that they were part of Cooper's equipment or that the Cooper crew brought them on board.").

incident"[61] and point to the lack of direct evidence that the Vessel crew moved the dolly and pipes. This is enough to create a disputed issue of fact but not enough to warrant summary judgment in Defendants' favor. *Cf. Howard v. Seaspan Corp.*, 2021 WL 2074151, at *4 (E.D. La. May 24, 2021) (denying defendant's motion for summary judgment where "the real deficiency in [the p]laintiff's proof that [the d]efendant's motion [was] grounded upon [was] the absence of any direct evidence to prove *who* [created the dangerous condition] and *when* that occurred" because the court was "not persuaded that circumstantial evidence is insufficient as a matter of law for [the p]laintiff to meet his burden of establishing by a preponderance of the evidence that [the d]efendant breached the [relevant] duty"). Because the critical factual issue of who had active control of the dolly and pipes is unresolved, summary judgment in favor of Defendants on this issue would be inappropriate.

## IV.    CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Defendants' motion for summary judgment (R. Doc. 37) is GRANTED as to Trigleth's turnover-duty claim and DENIED as to Trigleth's active-control-duty claim.

New Orleans, Louisiana, this 30th day of April, 2025.


BARRY W. ASHE
UNITED STATES DISTRICT JUDGE

---

[61] R. Doc. 41 at 9 (citing R. Doc. 37-5 at 173).