UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JOSEPH TRIGLETH | CIVIL ACTION |
| VERSUS | NO. 23-65 |
| OCEAN BELT MARITIME, INC., *et al.* | SECTION M (4) |

## ORDER & REASONS

Before the Court is a motion to exclude and strike plaintiff's marine expert evidence filed by defendants Ocean Belt Maritime, Inc. and Ocean Longevity Shipping & Management Company, Ltd. (together, "Defendants").[1] Plaintiff Joseph Trigleth responds in opposition,[2] and Defendants reply in further support of their motion.[3] Also before the Court is Trigleth's motion *in limine* to exclude or limit the testimony of Defendants' expert.[4] Defendants respond in opposition,[5] and Trigleth replies in further support of his motion.[6] Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons.

**I.   BACKGROUND**

This negligence suit under the Longshore and Harbor Workers' Compensation Act arises out of an incident on the Defendants' vessel, the M/V *Ocean Belt* (the "Vessel"). On January 29, 2021, in his capacity as a ship superintendent employed by non-party Cooper Consolidated, LLC ("Cooper"), Trigleth was overseeing cargo operations on the Vessel, which required him to traverse the deck, including a platform crossing over the ship's piping.[7] Trigleth alleges that, while

---

[1] R. Doc. 35.
[2] R. Doc. 39.
[3] R. Doc. 49.
[4] R. Doc. 36.
[5] R. Doc. 40.
[6] R. Doc. 42.
[7] R. Docs. 20 at 2; 38-3 at 1.

descending the steps from the cross-over platform, he tripped and fell on a dolly loaded with safety pipes positioned near the bottom of the stairs such that the pipes protruded onto the step, causing him serious injury.[8]

## II.    LAW & ANALYSIS

### A. *Daubert* Standard

A district court has discretion to admit or exclude expert testimony under the Federal Rules of Evidence. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court held that Rule 702 of the Federal Rules of Evidence requires a district court to act as a gatekeeper to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The reliability inquiry requires a court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert*, 509 U.S. at 592-93. In *Daubert*, the Supreme Court listed several non-exclusive factors for a court to consider in assessing reliability: (1) whether the theory has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the general acceptance of the

---

[8] R. Doc. 20 at 2-3.

methodology in the scientific community. *Id.* at 593-95. However, a court's evaluation of the reliability of expert testimony is flexible because "[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (quotations omitted). In sum, the district court must ensure "that an expert, whether basing testimony upon professional studies or personal experiences, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. The party offering the testimony must establish its reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

Next, the district court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will assist the trier of fact to understand the evidence, *i.e.*, whether it is relevant. *Daubert*, 509 U.S. at 591. An expert's testimony is not relevant and may be excluded if it is directed to an issue that is "well within the common sense understanding of jurors and requires no expert testimony." *Vogler v. Blackmore*, 352 F.3d 150, 155 (5th Cir. 2003). Further, an expert cannot make "legal conclusions reserved for the court," credit or discredit witness testimony, or "otherwise make[] factual determinations reserved for the trier of fact." *Highland Cap. Mgmt., L.P. v. Bank of Am., N.A.*, 574 F. App'x 486, 491 (5th Cir. 2014).

Rule 702 also requires that an expert be properly qualified. Generally, if there is some reasonable indication of qualifications, the district court may admit the expert's testimony, and then the expert's qualifications become an issue for the trier of fact. *Rushing v. Kan. City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999), *superseded in part by statute on other grounds as noted in Lester v. Wells Fargo Bank, N.A.*, 805 F. App'x 288, 291 (5th Cir. 2020). A witness qualified as an expert is not strictly confined to his area of practice but may testify regarding related

3

applications; a lack of specialization goes to the weight, not the admissibility of the opinion. *Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C.*, 753 F. App'x 191, 195-96 (5th Cir. 2018).

The facts, data, and sources used in an expert's opinion are generally considered by the jury in weighing the evidence, but "in some cases 'the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion.'" *Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 F. App'x 344, 348 (5th Cir. 2020) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)). As the gatekeeper, a district judge must "extract evidence tainted by farce or fiction. Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all." *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996). "Generally, the fact-finder is entitled to hear an expert's testimony and decide whether the predicate facts on which the expert relied are accurate. At the same time, however, expert testimony that relies on completely unsubstantiated factual assertions is inadmissible." *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013) (internal quotation marks, alterations, and citations omitted). Ultimately, the expert must "'bring to the jury more than the lawyers can offer in argument.'" *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (quoting *In re Air Crash Disaster at New Orleans*, 795 F.2d 1230, 1233 (5th Cir. 1986)).

### B. Defendants' Motion to Strike and Exclude Trigleth's Marine Expert Evidence

In support of his claims, Trigleth retained Captain Ronald L. Campana as a marine expert. Defendants contend that any opinions and testimony he would offer would be inadmissible and that "Campana has been excluded on multiple occasions in this [d]istrict for essentially identical reasons" as those raised in Defendants' motion.[9] Defendants argue that Campana's opinions

---

[9] R. Doc. 35-1 at 1-2 (quote at 2) (citing *Badeaux v. Eymard Bros. Towing Co.*, 2021 WL 4860300, at *6 (E.D. La. Oct. 19, 2021); *Jumonville v. Progressive Sec. Ins. Co.,* 2024 WL 3044653, at *2 (E.D. La. June 18, 2024)).

regarding the lighting on the deck of the Vessel,[10] the measurements of the dolly and pipes,[11] and the timing of the accident in relation to the stevedore crew's break[12] are objectively wrong and contradicted by other evidence. Defendants also argue that Campana's opinions that the Vessel crew moved the dolly and pipes,[13] failed to make rounds on the Vessel during cargo operations,[14] and failed to comply with the Vessel's Safety Management System ("SMS")[15] are speculative. Defendants then contend that Campana's references to the International Safety Management Code ("ISM Code") are "legally irrelevant" because "American courts have resoundingly held that the ISM Code does not apply to §905(b) claims."[16] Defendants also contend that Campana's report and opinions are not necessary to help the jury understand "the straightforward, common-sense mechanics of the alleged incident in this case."[17] Finally, Defendants argue that Campana's report and opinions do not apply any discernable methodology and, "to the extent Campana generically relies on his years of experience on vessels in his report, he does not tie any of his purported opinions to that experience."[18]

In opposition to Defendants' motion, Trigleth argues that Campana's opinions are not based on unsubstantiated factual assertions but on his review of the materials cited in his report and his experience and familiarity with similar vessels and their safety procedures.[19] Trigleth also asserts that Campana's conclusions that Defendants deem speculative are "reasonable

---

[10] *Id.* at 9-10.
[11] *Id.* at 12-13.
[12] *Id.* at 14-15.
[13] *Id.* at 10-12.
[14] *Id.* at 13-14.
[15] *Id.* at 15.
[16] *Id.* at 15-16 (emphasis omitted) (quote at 15) (citing *Jones v. Sanko S.S. Co.*, 148 F. Supp. 3d 374, 392 (D.N.J. 2015); *Horton v. Maersk Line, Ltd.*, 603 F. Appx. 791, 797 (11th Cir. 2015)).
[17] *Id.* at 16-17.
[18] *Id.* at 20-23 (quote at 22).
[19] R. Doc. 39 at 2.

conclusion[s] based upon the evidence"[20] and Campana's experience. Trigleth argues that, as to each of the particular conclusions to which Defendants object, they "may use 'vigorous cross-examination' and the 'presentation of contrary evidence'" to discredit Campana.[21] As to Defendants' objection to Campana's application of the ISM Code, Trigleth argues that Defendants "cannot point to any case law in the Fifth Circuit which holds that the ISM is 'legally irrelevant,'"[22] and Campana, as "an accredited ISM auditor … is qualified to give opinions about ISM requirements."[23] Trigleth asserts that Campana's opinions are necessary because "[t]he average juror is not familiar with cargo operations and does not have the experience of working with the vessel's crew aboard a cargo vessel during cargo operations"[24] and "the manner in which [Campana] has applied his years of experience and training … to the facts of the case to reach his conclusions and opinions … will assist the jury in understanding cargo operations aboard bulk cargo ships and the interactions between the stevedore and the vessel's crew."[25]

In their reply, Defendants assert that Trigleth's arguments regarding Campana's opinion on the lighting are based on a "sham affidavit,"[26] which was issued after Campana authored his report and therefore was "not part of Campana's reliance materials … and cannot form the basis of any of his opinions."[27] Defendants again argue that Campana's conclusions are contradicted by other evidence, including Trigleth's own deposition testimony.[28] Then, Defendants repeat their

---

[20] *Id.* at 5.
[21] *Id.* at 4, 6, 8, 9 (alteration omitted) (quoting *Badeaux*, 2021 WL 4860300, at *3).
[22] *Id.* at 10-11. Relying on *Clements v. Quark, Ltd.*, 2007 WL 9778107, at *4 (E.D. La. Apr. 10, 2007) ("The entities regulated by the ISM Code are either 'vessels' or 'companies.'"), Trigleth asserts that "by the reasoning set forth by [the *Clements* court], the ISM Code applies to owners and managers such as [Defendants]." R. Doc. 39 at 11-12.
[23] *Id.* at 11.
[24] *Id.* at 13.
[25] *Id.* at 14.
[26] R. Doc. 49 at 1.
[27] *Id.* at 2 (emphasis omitted).
[28] *Id.* at 7.

argument that the ISM Code does not apply in this matter and assert that the "decision in *Clements v. Quark* is entirely inapposite" because the *Clements* court "did not address at all the inapplicability of the ISM Code to claims under § 905(b)."[29]  Finally, Defendants again assert that "Campana relies on incorrect facts" and that some of his conclusions are "legally wrong."[30]

Defendants do not challenge Campana's qualifications to testify as an expert in marine safety.  Instead, they contend that his opinions are wrong or speculative, refer to inapplicable law, opine on common-sense matters that the jury could evaluate on its own, and were not reached by the application of any specialized knowledge or methodology.  As Defendants point out, "only two [pages of Campana's nine-page report] include proffered opinions."[31]  However, because Campana indicates that "[a]ll opinions included in the Background Information and Statement of Facts [section] are intended to be incorporated here as well as Conclusions and Opinions,"[32] the Court looks beyond the "Conclusion and Opinions" section of Campana's report.  Having determined that none of Campana's conclusions or opinions satisfies Rule 702 and the *Daubert* standards, the Court addresses the deficiencies of each.

In a section of his report titled "Summary of Facts and Opinions," Campana asserts that "[o]nly the ship's crew could have moved the dolly and stanchions to the location where they became an obstruction."[33]  He does not apply any specialized knowledge to reach this conclusion but instead seems to rely entirely on Trigleth's testimony that, generally, "it was the ship's crew who placed the stanchions and safety rails and Cooper's crew never touched them," and "he did not request the vessel crew place the stanchions around the hatch cover" that night.[34]  Then, in the

---

[29] *Id.* at 9-10 (emphasis omitted).
[30] *Id.* at 10 (emphasis omitted).
[31] R. Doc. 35-1 at 4 (emphasis omitted) (discussing R. Doc. 35-3 at 7-8).
[32] R. Doc. 35-3 at 8.
[33] *Id.* at 6.
[34] *Id.*

"Conclusion and Opinions" section of his report, Campana repeatedly relies on this assertion (*i.e.*, that the Vessel crew moved the dolly) to suggest that "safety guidelines were not followed *by the vessel*," "[w]hoever *in the crew* transported the dolly with the stanchions and parked it just forward of the step/platform between hold 5 and 6, did so in a dangerous and haphazard manner," "this accident was totally avoidable had *the vessel* followed standard safety protocols in not obstructing a walkway or pathway," "[s]omeone instructed a *crewmember* to place the dolly just forward of the step/platform," and "the *crewmember* who left [the dolly] in that position was improperly trained and supervised."[35] Who moved the dolly is a contested issue of fact. Because it does not appear that Campana applied any specialized knowledge, expertise, or methodology in reaching the conclusion that the Vessel crew moved it, his resolution of that issue would not be helpful to a jury and therefore must be excluded. *See Badeaux*, 2021 WL 4860300, at *5 (excluding Campana's opinion regarding a contested issue because "Campana's resolution of this factual dispute [did] not reflect the application of any expertise").

Campana also reaches a conclusion about the lighting on the Vessel without applying any expertise. He states that "[m]ore probably than not, *based on Mr. Trigleth's testimony*, the crane was swinging the bags to the barge and there was no light(s) shining in the area between holds 5 and 6 which had the step/platform in the dark."[36] Campana does not identify any specialized knowledge that informed this conclusion, nor the testimony upon which it is purportedly based, likely because nothing in Trigleth's deposition testimony supports this conclusion.[37] And, as the Defendants point out,[38] Trigleth's March 25, 2025 affidavit (in which he further describes the

---

[35] *Id.* at 8 (emphasis added).
[36] *Id.* (emphasis added).
[37] During his deposition, Trigleth did not indicate that there were any issues with the lighting the night of the accident and did not specifically address the lighting near the cross-over platform. *Id.* at 10.
[38] R. Doc. 49 at 1-2.

8

lighting conditions on the night of the accident)[39] was not part of Campana's reliance materials,[40] and so could not have been the basis for this opinion. Because this opinion is based on dubious "facts," *Guillory*, 95 F.3d at 1331, it, too, is unhelpful and must be excluded.

Campana's conclusions and opinions also include restatements of testimony and basic facts from the record, which the jury needs no help understanding. Campana's first conclusion/opinion is that "[t]he [Vessel] is a gearless seven hold/hatch bulk carrier that was discharging bags of cargo in Laplace on December 29, 2021 [and] is a standard mini supply vessel."[41] It is unclear how these basic facts[42] are relevant, much less helpful to the jury in assessing Trigleth's negligence claims. Campana also "concludes" that "Trigleth passed over this platform numerous times during his shift on the vessel and it was not until they took a break and came back that he had a problem. He testified he never saw the dolly until he slipped."[43] This is a restatement of the timeline established by the record and Trigleth's testimony.[44] In his "Summary of Facts and Opinions," Campana states that "[t]he photographs [he] reviewed of the measurements of the dolly and aluminum stanchions … show the dolly flat surface to be 31.5″ in length and the aluminum stanchions to be 43″ in length [and] the dolly closely aligned with the step."[45] Campana did not personally inspect or measure the Vessel, the dolly, or the pipes,[46] and, as such, these statements are not made based on his first-hand experience or expertise. The jury can hear testimony as to these same observations and make

---

[39] R. Doc. 38-3 at 4-5.
[40] *See* R. Doc. 35-3 at 2.
[41] *Id.* at 8.
[42] The events giving rise to this case occurred on January 29, 2021, not December 29, 2021.
[43] *Id.*
[44] The Defendants take issue with Campana's use of the word "break" here, which Trigleth argues "may be a matter of semantics, with the [D]efendants interpreting a 'break' to be a 'lunch break,'" as opposed to the "'break' between the time the Cooper crew boarded the vessel and the time of [the] accident" and Trigleth's taking "breaks during his work to complete paperwork for his employer." R. Doc. 39 at 9. In any event, Campana applies no expertise in reaching this conclusion and any determination of the issue of when and how the dolly appeared in the location it was in at the time of the accident is for the jury.
[45] R. Doc. 35-3 at 7.
[46] *Id.* at 4 ("I have not personally inspected the MV *Ocean Belt*.").

9

its own conclusion – including possibly the same conclusion as Campana's that "it is possible the stanchions overhung the dolly by up to 12″"[47] – by viewing the same photographs and applying simple math. Because the jury "does not require expert testimony to discern [such] basic facts," *Badeaux*, 2021 WL 4860300, at *4, these conclusions and opinions also must be excluded.

Campana also makes general statements about the safety and propriety of the placement of the dolly, including that "[t]he crew of the [Vessel] should have been trained not to leave a portable dolly near the step/platform over the deck piping and specifically not to create a hazard to the walkway,"[48] the placement of the dolly "just forward of the step/platform between hold 5 and 6 [was] dangerous and haphazard," "[a] rolling dolly should never be left on deck unsecured," and "[s]tanchions overhanging a step is never permitted."[49] A jury is capable of assessing the obvious dangers posed by leaving a rolling dolly unsecured on a ship or creating a tripping hazard on a set of stairs "using only their common experience and knowledge." *Peters v. Five Star Marine Serv.*, 898 F.2d 448, 450 (5th Cir. 1990); *see also Badeaux*, 2021 WL 4860300, at *4 ("Most of Campana's opinions are mere restatements or summaries of facts in the record, often coupled with an assertion that plaintiff's behavior was 'not proper,' that he 'failed' to take some proper course of action, or that he 'showed poor judgment.' The [c]ourt excludes these opinions because they do not 'help the trier of fact to understand the evidence or to determine a fact in issue.'" (footnote omitted) (quoting Fed. R. Evid. 702(a)).

Finally, Campana makes conclusions regarding the Vessel's compliance with unspecified "safety guidelines" and "protocols." He asserts that "*safety guidelines* were not followed by the [V]essel"[50] and that "this accident was totally avoidable had the [V]essel followed *standard safety*

---

[47] *Id.* at 7.
[48] *Id.*
[49] *Id.* at 8.
[50] *Id.* (emphasis added).

10

*protocols* in not obstructing a walkway or pathway."[51] Not only are these opinions evidently based on his conclusion that it was the Vessel crew who moved the dolly – a contested issue which he attempts to resolve without applying any expertise[52] – but they also purport to apply guidelines and standards that Campana does not identify. Campana admittedly did not review the Vessel's own safety protocols,[53] and the only provision of the ISM Code cited by Campana is section 1.2.2, which provides that a vessel's "[s]afety-management objectives" should:

> 1  provide for safe practices in ship operation and a safe working environment;
>
> 2  assess all identified risks to [a company's] ships, personnel and the environment and establish appropriate safeguards; and
>
> 3  continuously improve safety management skills of personnel ashore and aboard ships including preparing for emergencies related both to safety and environmental protection.[54]

To the extent that Campana's opinions that "safety guidelines" and "standard safety protocols" were violated involved his applying this section of the ISM Code (even if it were applicable), he does not identify the facts establishing these violations nor explain how these standards apply to those facts. Campana also asserts that:

> There is a duty officer on watch and while working cargo either the duty officer or his designee must be on the deck observing the cargo operations. Beside their duty to make rounds every hour or a time interval set in their SMS, they also monitor the stevedoring operations to ensure no damage is done during the operation to cargo or the vessel.[55]

Again, Campana does not cite any provision of the ISM Code or other authority supporting the proposition that the Defendants were required to post a duty officer, make rounds at certain intervals, and "monitor the stevedoring operations," nor does he offer any facts supporting his

---

[51] *Id.* (emphasis added).
[52] *See supra* at 7-8.
[53] R. Doc. 35-3 at 7 ("I do not have the SMS of the [V]essel.").
[54] *Id.* at 6.
[55] *Id.* at 8.

11

implied conclusion that these requirements were not met in this case. An expert seeking to testify that a practice violates an industry standard must identify the standard and explain how the practice violates those standards. *See Benavides v. Cnty. of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992) (excluding expert testimony because, *inter alia*, expert "never described the content of the standards to which he referred or explained how the deputies' training failed to meet those standards"); *Cooper v. City of La Porte Police Dep't*, 608 F. App'x 195, 198-99 (5th Cir. 2015) (citing *Benavides*, 955 F.2d at 973). Thus, these unsupported conclusions must also be excluded.

In sum, none of Campana's opinions and conclusions will "help the trier of fact to understand the evidence or to determine a fact in issue" and none are "the product of reliable principles and methods." Fed. R. Evid. 702. Thus, Campana's report is excluded in its entirety.

## C. Trigleth's Motion to Exclude or Limit Testimony of Defendants' Expert

Defendants retained Captain Gajanan Karanjikar as their expert. Trigleth moves to exclude or limit Karanjikar's testimony because some of his opinions relate to "the field of biomechanical engineering and accident reconstruction," which he is not qualified to opine on,[56] and he "relies upon completely unsubstantiated factual assertions"[57] and "inappropriately comments on issues of credibility and makes factual determinations reserved for the jury."[58] Trigleth argues that Karanjikar's opinion, based on measurements of an exemplar dolly, that the pipes "would necessarily have been lower than the step" is not supported by any evidence because Karanjikar admits that the dolly he measured was not identical to the one involved in the accident.[59] Trigleth also contends that Karanjikar's "theory" that "Trigleth did not use the cross-over steps to cross over the ship's pipes but, instead, crossed directly over the pipes themselves at another location …

---

[56] R. Doc. 36-1 at 2.
[57] *Id.* at 4.
[58] *Id.* at 5.
[59] *Id.* at 5-6 (quote at 6)

[is] merely the result of his subjective belief and speculation and [is] designed to mislead the jury" and amounts to impermissible "legal conclusions."[60]

In opposition to Trigleth's motion, Defendants assert that Karanjikar does not opine on biomechanical engineering, Trigleth's proffered expert "was allowed [in another case] to testify over the exact same objections [that Trigleth] makes here,"[61] and Karanjikar's years of experience and personal inspection of the Vessel "exceed the minimal 'accident reconstruction' credentials/ reliance materials that this Court found sufficient" in another case.[62] Defendants also argue that because the dolly involved in the accident is no longer available, the exemplar dolly is the best available evidence,[63] and Karanjikar's conclusions regarding the characteristics of the dolly are based on his first-hand inspection of the exemplar dolly and the Vessel and his years of experience using similar equipment onboard similar Vessels.[64] Defendants then contend that Karanjikar's assessment of the purported inconsistencies between Trigleth's account of the accident and the features of the Vessel "will assist the jury as the finder of fact in assessing the inconsistent versions of [the] alleged incident,"[65] which would "be much more difficult for the jury to understand and appreciate" without the context provided by Karanjikar's expert testimony.[66]

In his reply, Trigleth first notes that "[D]efendants appear to agree with" Trigleth's argument that Karanjikar's opinions discrediting Trigleth's testimony should be excluded,[67] and argues that his motion should therefore be granted with respect to those opinions. Trigleth then maintains that "it is evident that [Karanjikar] is applying" biomechanical-engineering principles

---

[60] *Id.* at 11-12.
[61] R. Doc. 40 at 4 (citing *In re FMT Indus., LLC*, 2024 WL 2803202, at *5-6 (E.D. La. May 31, 2024), *aff'd sub nom. In re Ingram Barge Co.*, 2025 WL 81546 (5th Cir. Jan. 13, 2025)).
[62] *Id.* at 6 (citing *Westley v. Out W. Express, LLC*, 2024 WL 1098769, at *3 (E.D. La. Mar. 7, 2024)).
[63] *Id.* at 7-8.
[64] *Id.* at 8.
[65] *Id.* at 9-10 (quote at 10).
[66] *Id.* at 11.
[67] R. Doc. 42 at 1-2 (quote at 2) (quoting R. Doc. 40 at 2 n.2).

and that Defendants' reliance on *FMT Industries* is misplaced because Campana was permitted only to testify as to "the effects of vessel movement," not "the physics of a fall."[68] Trigleth then asserts that Karanjikar's use of the exemplar dolly does not satisfy the "substantially similar" test because it "runs the danger of creating unfair prejudice or confusion in violation of [Federal Rule of Evidence] 403."[69] Finally, Trigleth maintains that "Karanjikar is serving as an advocate instead of an expert for the defendants" by suggesting that Trigleth attempted to cross the pipes at a different location than the cross-over platform.[70]

The Court agrees that the section of Karanjikar's report titled "Inconsistencies in Mr. Trigleth's account of the fall"[71] does impermissibly "venture into the field of biomechanical engineering and accident reconstruction."[72] Defendants deny that Karanjikar "attempt[s] to determine any 'injury causation forces' or how a 'hypothetical person's body will respond to those forces.'"[73] While Karanjikar may not have analyzed the forces that caused Trigleth's *injuries*, he clearly applies principles of biomechanical engineering[74] by evaluating how certain forces would have impacted Trigleth's fall in various scenarios, taking into account Trigleth's height and the physical characteristics of the stairs, the Vessel, and the dolly.[75] Karanjikar even states in his

---

[68] *Id.* at 2-4 (citing *FMT Industries*, 2024 WL 2803202, at *5-6; *Badeaux*, 2021 WL 4860300, at *5).
[69] *Id.* at 5-6 (quote at 6).
[70] *Id.* at 7.
[71] R. Doc. 36-2 at 9-10.
[72] R. Doc. 36-1 at 2.
[73] R. Doc. 40 at 3.
[74] "Biomechanical engineering applies 'the principles of mechanics to the facts of a specific event and provides information about the forces generated in that event,' and may 'explain how the body moves in response to those forces.'" *Ramirez v. Escajeda*, 2021 WL 1131721, at *10 (W.D. Tex. Mar. 24, 2021) (alterations omitted) (quoting *Bowers v. Norfolk S. Corp.*, 537 F. Supp. 2d 1343, 1377 (M.D. Ga. 2007), *aff'd*, 300 F. App'x 700 (11th Cir. 2008)).
[75] R. Doc. 36-2 at 10. *See id.* at 9-10 ("[The dolly's] height relative to his body would have made it an obstruction (i.e. braced his fall) rather than a contributing factor to his fall. … [Trigleth's height] mak[es] it improbable that he could have grabbed the handle in mid-fall. Instead, his thighs would have struck the handle first, arresting or altering his fall trajectory. … [I]t is unlikely Mr. Trigleth would have been able to grab the handle without falling all the way to the deck. … [H]is balance would have been compromised even before slipping. … A deliberate lateral force would have been needed for the dolly to move. … [H]is natural momentum would have directed his fall forward or backward rather than sideways.").

report that "the fundamental issue is *the mechanics of his fall*."[76] As Trigleth points out, another court in this district has held that "a marine safety professional … is not 'qualified by knowledge, skill, experience, training, or education' to conduct a biomechanical analysis regarding *the physics of [a] plaintiff's fall*." *Badeaux*, 2021 WL 4860300, at *5 (alteration omitted; emphasis added) (quoting Fed. R. Evid. 702). Thus, Karanjikar is not qualified to testify, and so will not be allowed to testify, about the mechanics of Trigleth's fall, including the contents of the section of his report titled "Inconsistencies in Mr. Trigleth's account of the fall."

Trigleth also argues that Karanjikar's opinions based on the measurements of the dolly in relation to the height of the stairs and pipes are "speculative" because Karanjikar admittedly did not use the same dolly that was involved in the accident.[77] However, the dolly allegedly involved in the accident was not available to Defendants, and Defendants assert that they used the best available alternative, "as confirmed by comparison/contrast with a roughly contemporaneous photograph of the dolly onboard in 2021."[78] While Trigleth argues that "Karanjikar's recreation of the accident scene [using the exemplar dolly] does not satisfy the 'substantially similar' test," he does not identify any differences between the exemplar dolly and the dolly photographed in 2021.[79] The "substantial similarity" test does "not require[] that all the conditions shall be precisely reproduced, but they must be so nearly the same in substantial particulars as to afford a

---

[76] *Id.* at 9 (emphasis added).

[77] R. Doc. 36-1 at 5-6. Trigleth also objects to Karanjikar's "use[ of] pipes/stanchions which he alleges are 40 inches long – despite the fact that the stanchions pictured the day after Mr. Trigleth's accident are similar to stanchions measured during the inspection which are 43 inches long." R. Doc. 42 at 5-6. However, as Trigleth states in his opposition to Defendants' motion to exclude Campana's report, "there are at least two sets of pipe – one is 40 [inches long] and the other is 43 [inches long]." R. Doc. 39 at 7. Thus, it seems which set of pipes were involved in the accident (and therefore, the length of those pipes) is in dispute and Karanjikar's reliance on one measurement rather than the other is not a basis for excluding this conclusion. "'When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249 (5th Cir. 2002) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments).

[78] R. Doc. 40 at 7.

[79] R. Doc. 42 at 4.

15

fair comparison in respect to the particular issue to which the test is directed." *Barnes v. Gen. Motors Corp.*, 547 F.2d 275, 277 (5th Cir. 1977) (quoting *Ill. Cent. Gulf R.R. Co. v. Ishee*, 317 So. 2d 923, 926 (Miss. 1975)). Thus, assuming Defendants can "lay a proper foundation demonstrating a similarity of circumstances and conditions," *id.*, the Court will not preclude Karanjikar from testifying regarding his observations of the exemplar dolly based on the mere fact that the dolly is not the same as the one in the accident.[80]

Trigleth also objects to Karanjikar's conclusion regarding the positioning of the pipes on the dolly, specifically that:

> if the pipes/stanchions did protrude beyond the dolly platform, it would have been logical and natural for the [Vessel] crew to have placed the protruding free ends towards the free end of the dolly platform … rather than have them protruding from the aft (towards the step) because the dolly was reportedly located with its handle adjacent to the step and had these stanchions been protruding from the aft, where the handle was, they would have proven impediments for the crew pushing the dolly because the pipes would have struck their legs while taking a step, something no crew member would do.[81]

Although Defendants argue that "expert testimony regarding standard crew operations involving dolly operations on a vessel has been accepted in at least one other case before another section of this Court as helpful to the finder of fact with regard to shipboard operations,"[82] Karanjikar's opinion in the context of this case is not based on his experience or expertise in "standard crew operations involving dolly operations on a vessel," but on the common-sense notion that most people loading a dolly would not do so in such a way as would cause the load to "str[ike] their legs while taking a step," a conclusion lay jurors could reach on their own "using only their common

---

[80] Defendants repeatedly refer to the "2021 dolly photo" to which the exemplar dolly was compared, R. Doc. 40 at 7, but this photo is not identified in Defendants' motion or Karanjikar's report. The precise date of the 2021 photograph and whether the dolly depicted in it was the actual dolly involved in the accident are unclear.
[81] R. Doc. 36-2 at 8.
[82] R. Doc. 40 at 8-9 (citing *Owens v. Abdon Callais Offshore, LLC*, 2011 WL 3654239, at *2 (E.D. La. Aug. 19, 2011) (crediting testimony of an "expert in the field of offshore safety and safe work practices who indicated that, once the hose was on the dolly, there would have been no need to lift the hose, because one could roll the hose straight from the dolly to the hose rack"), *aff'd*, 471 F. App'x 353 (5th Cir. 2012)).

16

experience and knowledge." *Peters*, 898 F.2d at 450. Karanjikar's testimony on this point is therefore excluded.

Trigleth also argues that Karanjikar should not be permitted to testify regarding his suspicion that Trigleth "attempted to cross the ship's pipelines at an unauthorized and unsafe location, contributing to his alleged fall,"[83] because this "conclusion and opinion are merely the result of his subjective belief and speculation and are designed to mislead the jury."[84] Aside from his assertion that, in his experience, "stevedores often choose to bypass the platform steps and cross over the pipelines" because they are "farther away" and "cumbersome to climb"[85] – which, even if true generally, is speculative as applied to Trigleth in the specific instance giving rise to this case – Karanjikar applied no expertise to arrive at the conclusion that Trigleth crossed the pipes at an "unauthorized and unsafe location." The rest of the support Karanjikar offers for this conclusion (that the fall location Trigleth marked on a schematic diagram of the vessel during his deposition "does not correspond to the authorized or safe crossing point over the deck pipelines"[86] and that he noted on the incident report that he fell "into the ship's pipes"[87]) are discrepancies that can be understood by the jury without expert assistance. Likewise, Karanjikar's opinion that Trigleth "was likely using his phone and looking at its screen, [which] likely distracted him and even compromised his ability to accurately assess heights"[88] is based solely on Trigleth's deposition testimony and is not the result of Karanjikar's application of any expertise.[89] Thus, Karanjikar may not testify as to whether Trigleth crossed the pipes at a location other than the crossover steps or whether he was distracted while crossing the pipes.

---

[83] R. Doc. 36-2 at 14.
[84] R. Doc. 36-1 at 12.
[85] R. Doc. 36-2 at 13.
[86] *Id.*
[87] *Id.* at 14.
[88] *Id.* at 18.
[89] *See id.* at 6.

Finally, Defendants concede,[90] and the Court agrees, that Karanjikar may not comment on Trigleth's credibility, specifically with respect to his "opinion" that Trigleth's account of the accident "was a cover up for not adhering to safe practices,"[91] and that Trigleth was withholding photographs of the scene of the accident.[92] Experts are not permitted to credit or discredit witness testimony. *Highland Cap. Mgmt.*, 574 F. App'x at 491.

### III.  CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Defendants' motion to exclude and strike plaintiff's marine expert evidence (R. Doc. 35) is GRANTED and Trigleth's motion *in limine* to exclude or limit the testimony of Captain Gajanan Karanjikar (R. Doc. 36) is GRANTED IN PART and DENIED IN PART.

New Orleans, Louisiana, this 2nd day of May, 2025.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE

---

[90] R. Doc. 40 at 2 n.2 ("Defendants agree that Capt. Karanjikar's trial testimony shall be limited to exclude express statements or comments regarding Plaintiff's credibility and/or truthfulness, including those portions of his report quoted in the Motion at p. 8 and p. 14.").
[91] R. Doc. 36-2 at 17.
[92] *Id.* at 16-17.